UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH, FLORIDA

CASE NO.: _____

ESTATE OF BRIEUX DASH, by and
through Emma Dash; EMMA DASH,
individually; JADA S. DASH, individually;
B.D., J.R., by and through his Natural
Guardian, Emma Dash; N.D., by and through
his Natural Guardian, WARAPORN
CHOMCHUEN,

       Plaintiffs,
v.

UNITED STATES OF AMERICA,

       Defendant.
_____/

## COMPLAINT

Plaintiffs, ESTATE OF BRIEUX DASH ("ESTATE"), by and through Emma Dash; EMMA DASH ("EMMA"), individually; JADA S. DASH ("JADA"), individually; B.D., J.R. ("B.D."), by and through his Natural Guardian, Emma Dash; and N.D. ("N.D."), by and through his Natural Guardian WARAPORN CHOMCHUEN ("CHOMCHUEN"), hereby sue Defendant, UNITED STATES OF AMERICA ("USA"), and in support thereof allege:

## PARTIES

1. Plaintiff EMMA is a United States citizen and resident of West Palm Beach Florida, Palm Beach County. She married decedent Brieux Dash ("Decedent Dash") on May 26, 2006, and they remained married until his death by suicide on March 14, 2019. EMMA is the Administrator and Personal Representative for the ESTATE. She brings this action on behalf of the ESTATE and in her individual capacity.

2. Plaintiff JADA is a United States citizen and resident of West Palm Beach Florida, Palm Beach County. She was born on October 16, 2002 and is the adult daughter of Decedent Dash.

///

1

3. Plaintiff B.D. is a United States citizen and resident of West Palm Beach Florida, Palm Beach County. He was born on April 16, 2005 and is the minor son of Decedent Dash. EMMA, as Natural Guardian of B.D. is authorized to bring this action on his behalf.

4. Plaintiff N.D. is a United States Citizen. He was born on March 17, 2015, and is the minor son of Decedent Dash. CHOMCHUEN, as Natural Guardian of N.D. is authorized to bring this action on his behalf.

5. Defendant USA is a sovereign acting through its employees and agents of the West Palm Beach VA Medical Center ("WPBVAMC") and Department of Veterans Affairs.

## JURISDICTION

6. Plaintiffs bring this action against the USA pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2761 *et seq*., which vests exclusive subject matter jurisdiction in the Federal District Court.

## VENUE

7. Venue is proper in this judicial district pursuant to 28 U.S.C. §1402(b) and 32 CFR §750.32 because it is where the Defendant's negligence occurred.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. On August 21, 2020, the ESTATE submitted an administrative tort claim to the United States Department of Veteran affairs as required by 28 U.S.C. §§ 2401(c) and 2675(a) based on the wrongful death of Decedent Dash who died by suicide on March 14, 2019.

9. On November 25, 2020, EMMA submitted an administrative tort claim to the United States Department of Veteran affairs based on the wrongful death of her husband.

10. On March 9, 2021, JADA submitted an administrative tort claim to the United States Department of Veteran affairs based on the wrongful death of her father.

11. On March 9, 2021, B.D. submitted an administrative tort claim to the United States Department of Veteran affairs based on the wrongful death of his father.

12. On March 9, 2021, N.D. submitted an administrative tort claim to the United States Department of Veteran affairs based on the wrongful death of his father.

13. On November 18, 2021, the U.S. Department of Veteran Affairs denied each of Plaintiffs' administrative tort claims because the "valuation of these claims" were not amenable to administrative resolution.

///

**STATEMENT OF FACTS**

14.     Decedent Dash was admitted to Unit 3C, a locked mental health unit at WPBVAMC on March 11, 2019, after he attempted suicide earlier that morning.  This was his second suicide attempt in less than four (4) years.  For the past "several days" he thought his family would be better off if he was dead so he used a belt and tried to hang himself.

15.     On March 11, 2019, Decedent Dash was at high risk for suicide when he was involuntarily committed to Unit 3C.  He had lost his job and was facing financial ruin.  His father-in-law had recently passed away.  His PTSD was exacerbated as he witnessed EMMA grieve the loss of her father and struggle with incapacitating pain caused by her Crohn's disease.

16.     Four (4) days before he attempted suicide, Decedent Dash received an "Important Notice" from the Department of Veterans Affairs which needed a reply within 60 days.  He was informed he had been overpaid $19,857 in separation pay and his service-connected disability payments were going to be withheld until the entire amount was repaid.  This "Important Notice" sent Decedent Dash into a downward spiral of depression, anxiety, emotional distress, and fragility.

17.     Before his March 11, 2019, involuntary commitment, Decedent Dash suffered from the moral injury, invisible injuries of war, and PTSD he developed after two (2) deployments to Iraq.  During these deployments, he was ambushed and beaten by the enemy; witnessed a soldier crushed between two (2) Bradley Fighting Vehicles; saw the bloody body parts of his two (2) closest friends after they were killed in a rollover accident; and helplessly stood by as he watched innocent children being murdered.

18.     On June 28, 2016, Decedent Dash received a 30% service-connected disability rating for his depression and PTSD.  This disability rating increased to 50% on November 15, 2018.

19.     EMMA wanted her husband admitted to Unit 3C because she worked as a pharmacy technician at WPBVAMC.  She believed Unit 3C would be the safest and most secure place for him to be treated.

20.     On March 14, 2019, Decedent Dash was isolated behind a closed door, and hidden from observation by any mental health staff, when he died by suicide in room 235-1.  He was a red flag high risk suicide patient who used a weight-bearing garment to create a noose, place it around his neck, and hang himself from the corridor door of his room.  His pulseless,

cyanotic body with a "significant scar" around his neck was found by another patient. No one knew how long he had been down. Decedent Dash was subsequently placed on a stretcher, draped with the United States Flag, and sent to the morgue.

21. Decedent Dash's inpatient death by suicide is considered a "never event." "Patient suicide, or attempted suicide resulting in serious disability, while being cared for in a healthcare facility is a 'never event.' Never events, as defined by the Agency for Healthcare Research and Quality, are serious adverse events occurring in hospitals that are largely preventable and of concern to both the public and to health care providers."

22. After his demise, the VA Office of Inspector General conducted an inspection of WPBVAMC which identified several deficiencies that substantially caused or contributed to Decedent Dash's tragic death. These deficiencies include, but are not limited to:

    a. The method by which mental health staff conducted and documented patient observation rounds failed to ensure Decedent Dash's safety. Unit 3C had a baseline level of observation requiring that all patients be checked every 15 minutes. Staff were required to use a pre-printed form to document the patient's location, behavior and activity at the time of observation. Decedent Dash's observation form did not document any of his behavior or activity from 3:15 p.m. on March 14, 2019, until he was found nonresponsive, pulseless and cyanotic shortly after 6:00 p.m. The Office of Inspection General ("OIG") investigation revealed Unit 3C had "no process of oversight regarding the correct implementation, validity or accuracy of the 15-minute pre-printed check forms or process."

    b. WPBVAMC "lacked a policy or clear expectations regarding 15-minute safety rounds, and staff did not have a consistent understanding of their duties with regard to the safety rounds." One of the staff assigned to conduct Decedent Dash's 15- minute safety checks was assigned to perform other duties during that time in violation of Unit 3C protocol. This deficiency is particularly egregious because in 2011, the Office of Inspection General conducted an inspection of WPBVAMC after two patients attempted suicide at the facility. The investigation revealed that "health technicians, who were assigned to perform 15-minute safety rounds, were also sometimes assigned concurrent duties." The OIG mandated

        that action be taken to ensure staff compliance with the observation policy requirements.

c. Risk mitigation strategies on Unit 3C did not reliably ensure Decedent Dash's safety. The Interdisciplinary Safety Inspection Team ("ISIT") knew that patient safety cameras, which were required pursuant to policy, had not been operational for at least three years due to inadequate network capabilities. The ISIT is a mandatory subcommittee of the WPBVAMC's Environment of Care Committee ("EOCC"). The OIG concluded Unit 3C staff could have intervened and prevented Decedent Dash's death by suicide had "the cameras been fixed and monitored as required by policy."

d. The ISIT and other responsible staff "failed to recognize the risk, and implement abatement strategies, of corridor doors as anchor points that could potentially be used by patients to hang themselves." Risk mitigation strategies regarding corridor doors on Unit 3C were "minimal, lacking both insight and effectiveness."

e. The ISIT knew a patient could use the top of a corridor door to anchor a ligature that would facilitate a suicide by hanging. This is precisely how Decedent Dash carried out his suicide. He used a garment as a lanyard that was knotted at the end and attached over the top of a corridor door while on a locked mental health unit at the West Palm Beach VA Medical Center.

f. The ISIT never implemented any risk strategies, such as requiring that corridor doors be left open, to prevent this from happening. Instead, Decedent Dash was allowed to enter his room in a rage of anger and close the door behind him so he could be hidden from staff observation. This should never have been allowed to happen with a patient who had attempted suicide on at least two prior occasions.

g. The Department of Veterans Affairs was well aware of its duty to protect Decedent Dash from environmental hazards that are established risks for the successful completion of in-patient suicide. In 2008, The Joint Commission Journal on Quality and Patient Safety published the article "Inpatient Suicide and Suicide Attempts in Veterans Affairs Hospitals" which advised the following:

      1. Over half of all inpatient suicide attempts, and over 40% of all successful inpatient suicides occurred in a VA inpatient psych ward;

      2. Hanging was the most common and most effective suicide method by patients under inpatient care of the VA Medical System;

      3. Doors and wardrobe cabinets accounted for 41.4% of the anchor points for suicide by hanging; and,

      4. Bedding was used as a ligature or noose in 39.7% of suicide or attempted suicide by hanging.

h. The Joint Commission Journal advised "patient characteristics that are associated with completed suicides (depressed mood, hopelessness, disconnection from others, suicidal idea, previous suicide attempts) are often not helpful in the prediction of imminent risk for a specific patient, especially on the psychiatric unit, where most of the patients will have many of the risk factors for suicide.  As a result, staff vigilance and, more importantly, a reduction of environmental hazards become critical barriers to suicidal behaviors."

i. This 2008 report specifically advised the Department of Veterans Affairs that "interior doors and cabinet doors can often be removed or replaced by accordion doors that cannot be used as anchor points."  However, despite this warning, the WPBVAMC did not replace interior patient room doors on the 3C Psych Ward with such accordion doors, and Decedent Dash used such a door as an anchor point in his suicide.

j. WPBVAMC failed to meet VHA requirements for staffing an ISIT.  It is required to conduct inspections of the facility's mental health unit using the Mental Health Environment of Care Checklist ("MHEOCC").  This checklist "was designed to help VHA facilities identify and address environmental risks for suicide and suicide attempts while patients are being treated on acute inpatient mental health units," also referred to as "locked mental health units."

k. WPBVAMC failed to meet VHA requirements for training staff regarding the MHEOCC.  This lack of required training was "due to some managers' inattention to training requirements."

      l.      Decedent Dash had no single unifying treatment plan that conveyed his specific plan of care with measurable goals as required by the Veterans Health Administration ("VHA") and The Joint Commission.

      m.      The staff on Unit 3C were negligent because they did not contact EMMA in a timely fashion to discuss discharge planning and obtain clinically appropriate collateral information. This "critically important" communication failure resulted in a significant delay of Decedent Dash's discharge and caused further destabilization of his physical and mental condition. He became so irritable, agitated, and upset that Tracey Ann Warren, P.A. could not perform his physical examination. Instead, in a fit of rage, Decedent Dash isolated himself behind the closed door of room 235-1 where he wrapped a self-made noose around his neck and hung himself from the corridor door. If Decedent Dash's mental health care providers would have contacted EMMA, they would have learned he was delusional when he thought she planned on leaving him for another man. Instead, they would have learned that during the last several weeks Decedent Dash was on a downward spiral as he became hopeless, depressed, and increased his alcohol consumption because he did not have a job and could not provide for his family. They would have also learned Decedent Dash could not cope with the stress he experienced as he watched EMMA grieve the recent death of her father while she was recuperating from the physical effects of her Crohn's disease.

23.      Plaintiffs are pursuing this wrongful death claim because the VA breached its duty to provide Decedent Dash with a place of safety and prevent his suicide. Decedent Dash was a 33-year-old Army Veteran who survived two (2) tours of duty in Iraq. Unfortunately, he could not survive the incompetent treatment he received from the VA for the moral injury, invisible injuries of war, and PTSD that drove him to death by suicide behind the closed door of room 235-1 on Unit 3C.

## CLAIM FOR NEGLIGENCE (WRONGFUL DEATH) AGAINST DEFENDANT, UNITED STATES OF AMERICA

24.      Plaintiffs allege paragraphs 1 though 23 as if fully stated herein.

///

///

25. As a provider of medical services to Decedent Dash, the USA, and its agents and employees at the WPBVAMC, had a duty to provide Decedent Dash with treatment that complied with the standard of care. The USA, and its agents and employees at the WPBVAMC, breached the duty of care they owed to Decedent Dash. These breaches in the standard of care, include, but are not limited to:

   a. The method by which mental health staff conducted and documented patient observation rounds failed to ensure Decedent Dash's safety.

   b. WPBVAMC "lacked a policy or clear expectations regarding 15-minute safety rounds, and staff did not have a consistent understanding of their duties with regard to the safety rounds." One of the staff assigned to conduct Decedent Dash's 15- minute safety checks was assigned to perform other duties during that time in violation of Unit 3C protocol.

   c. Staff failed to perform safety checks on Decedent Dash in the 15-minute intervals as required by protocol, and the documentation created by staff logging 15-minute safety checks of Decedent Dash on March 14, 2019, contain false entries.

   d. Risk mitigation strategies on Unit 3C did not reliably ensure Decedent Dash's safety. The ISIT knew that patient safety cameras, which were required pursuant to policy, had not been operational for at least three years due to inadequate network capabilities. The Unit 3C staff could have intervened and prevented Decedent Dash's death by suicide had "the cameras been fixed and monitored as required by policy."

   e. The ISIT and other responsible staff "failed to recognize the risk, and implement abatement strategies, of corridor doors as anchor points that could potentially be used by patients to hang themselves." Risk mitigation strategies regarding corridor doors on Unit 3C were "minimal, lacking both insight and effectiveness."

   f. WPBVAMC failed to meet VHA requirements for staffing an ISIT. It is a mandatory subcommittee of the WPBVAMC's Environment of Care Committee ("EOCC"), and it is required to conduct inspections of the facility's mental health unit using the Mental Health Environment of Care Checklist ("MHEOCC"). This checklist "was designed to help VHA facilities identify and address

  environmental risks for suicide and suicide attempts while patients are being treated on acute inpatient mental health units," also referred to as "locked mental health units."

g. WPBVAMC failed meet VHA requirements for training staff regarding the MHEOCC. This lack of required training was "due to some managers' inattention to training requirements."

h. Decedent Dash had no single unifying treatment plan that conveyed his specific plan of care with measurable goals as required by the Veterans Health Administration ("VHA") and The Joint Commission.

i. The staff on Unit 3C breached the standard of care they owed to Decedent Dash because they did not contact EMMA in a timely fashion to discuss discharge planning and obtain clinically appropriate collateral information.

26. As a direct and proximate result of these breaches of duty that the USA, and its agents and employees at the WPBVAMC, owed to Decedent Dash, Plaintiffs have sustained significant losses and are seeking all compensatory damages allowable under Florida and federal law for the wrongful and premature death of Decedent Dash including, but not limited to the following:

27. The ESTATE is entitled to recover damages allowable under (1) Fla Stat. §768.21 *et. seq.* for the loss of net accumulations which might reasonably have been expected but for the wrongful death of Decedent Dash and (2) memorial, funeral, and burial expenses.

28. EMMA, JADA, B.D., and N.D. are each entitled to recover damages allowable under Fla Stat. § 768.21 *et. seq.* for the (1) value of lost support from the date of the decedent's death, with interest and future loss of support and services; (2) loss of household/family guidance services; (3) loss of household/family accompaniment services; (4) loss of relationship and (5) compensation for the mental pain and suffering they have experienced since the date of Decedent Dash's death and will continue to experience for the remainder of their lives.

## RELIEF SOUGHT

29. Plaintiffs reallege paragraphs 1 through 28 as if fully stated herein.

30. WHEREFORE, ESTATE, EMMA, JADA, B.D., and N. D., respectfully seek and request the following relief:

///

a. That process issue and service be made and effected against Defendant in the manner prescribed by law;

b. That Judgment be granted in favor of the ESTATE against Defendant for compensatory damages and any other costs the ESTATE may be lawfully entitled to recover;

c. That Judgment be granted in favor of EMMA, JADA, B.D. and N.D. for compensatory damages and any other costs the Estate may be lawfully entitled to recover;

d. For the Court to make a determination as to all factual disputes and damages as to Defendant USA; and

e. For such additional and further relief as the Court may deem appropriate.

Dated this 5th day of January 2022.

Attorneys for PLAINTIFFS

By: */s/ Gary M. Gilbert*
Gary M. Gilbert
FL Bar No. 472026
GILBERT EMPLOYMENT LAW, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
301-608-0880 Telephone
301-608-0881 Facsimile
Gary-efile@gelawyer.com

By: */s/ Kevin L. Owen*
Kevin L. Owen
MD Bar No. 0512150020
GILBERT EMPLOYMENT LAW, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
301-608-0880 Telephone
301-608-0881 Facsimile
kowen-efile@gelawyer.com
***Pro Hac Vice Pending***

By: */s/ Peter G. Bertling*
Peter G. Bertling
CA Bar No. 131602
BERTLING LAW GROUP
21 East Canon Perdido Street
Suite 204B
Santa Barbara, CA 93101
(805) 879-7558 Telephone
(805) 869-1597 Facsimile
peter@bertlinglawgroup.com
***Pro Hac Vice Pending***