**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-80015-CIV-MIDDLEBROOKS/MATTHEWMAN**

ESTATE OF BRIEUX DASH, by and through
Emma Dash, EMMA DASH, JADA S. DASH,
B.D., J.R., by and through his Natural Guardian,
and N.D., by and through his Natural Guardian,
WARAPORN CHOMCHUEN,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

_____

**DEFENDANT UNITED STATES OF AMERICA'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant, United States of America, pursuant to Federal Rule of Civil Procedure 56 and

Southern District of Florida Local Rule 56.1, moves for summary judgment in its favor on the sole

negligence claim in Plaintiffs' Complaint [D.E. 1] because the undisputed facts show that there

was no breach of the standard of care by employees at the West Palm Beach Department of

Veterans Affairs Medical Center ("WPB VAMC") as it relates to the psychiatric treatment of

Brieux Dash in March 2019. The United States is entitled to judgment as a matter of law as a result.

## I.     INTRODUCTION

This case concerns the inpatient psychiatric and medical treatment Mr. Dash received at

the WPB VAMC when he was involuntarily admitted for such treatment in March 2019.  Despite

the extensive discovery undertaken to date, Plaintiffs cannot establish that Defendant, through the

WPB VAMC, breached the applicable standard of care for an inpatient psychiatric setting when

under any of the nine scenarios outlined by Plaintiffs in their Complaint. As explained in

Defendant's Motion to Exclude Stephen R. Bruce, Ph.D. filed contemporaneously with this Motion, Plaintiffs do not have a qualified expert witness to even opine on the applicable standard of care for each aspect of Plaintiffs' claim, a critical requirement for a medical negligence allegation in general. Furthermore, Plaintiffs are also unable to prove a causal link between any alleged breach of the standard of care and Mr. Dash's independent act of taking his own life. Therefore, Defendant is entitled to judgment in its favor as a matter of law.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### a.   WPB VAMC and Unit 3C

The WPB VAMC provides comprehensive services to meet the medical needs of veterans throughout the community. [SMF ¶1-2] As relevant to this case, the facility offers inpatient mental health services. [SMF ¶¶1-2, 8] The inpatient mental health services are provided in Unit 3C of the hospital. [SMF ¶2] Unit 3C is a high-intensity locked mental health care unit that functions as an acute, short-term stabilization unit for patients suffering from acute mental health distress. [SMF ¶1-2] Unit 3C is permanently staffed with numerous types of medical providers and support staff, such as psychiatrists, social workers, nurse practitioners, nursing assistants, and so on to assist and care for its patients.

Providers in Unit 3C fill out certain medical records electronically and other paperwork by hand, such as records reflecting periodic checks on patients. These periodic checks occur four times an hour, or every 15 minutes (the "15-minute rounds") for all patients while the patients are on the inpatient unit, unless otherwise indicated. [SMF ¶¶11-17]. These 15-minute rounds are documented on a one-page form reflecting a 24-hour period of observation, titled "Patient Observation Level Checklist." [SMF ¶¶14-16]

### b.  Brieux Dash's Involuntary Admission to the WPB VAMC in March 2019

In the early morning hours of March 11, 2019, Emma Dash called police to report that she had concerns about Mr. Dash potentially harming himself. [SMF ¶18] Mr. Dash was transported to WPB VAMC for an involuntary admission under Florida's Baker Act. [SMF ¶19] The Baker Act provides for up to 72 hours of involuntary commitment for evaluation and assessment.  *See* The Florida Mental Health Act, Chapter 394.

Mr. Dash remained on the inpatient psychiatric until from March 11, 2019 until March 14, 2019.  [SMF ¶¶21-23, 56] He refused to sign release of information forms for anyone, including his wife or his mother, on March 11, 2019. [SMF ¶25] During his time in Unit 3C, Mr. Dash met with numerous mental health professionals, including psychiatrists, nurses, certified nursing assistants ("CNAs"), social workers, and suicide prevention coordinators. As part of his standard treatment while in Unit 3C, CNAs performed the 15-minute rounds to confirm his safety.  [SMF ¶13] As of March 13, 2019, Mr. Dash's anticipated plans for his discharge plan involved him leaving Florida with his older son, B.D., to stay with his own mother, his listed next of kin, in upstate New York. [SMF ¶31] Mr. Dash signed a release of information for his mother on March 13, 2019, after which WPB VAMC staff spoke with Mr. Dash's mother to confirm she was in agreement with Mr. Dash's plans to come to stay with her.  [SMF ¶32, 33, 35]

On the morning of March 14, 2019, after his initial 72-hour period of evaluation expired, Mr. Dash signed paperwork to remain on the inpatient psychiatric unit on a voluntary basis. [SMF ¶40] Mr. Dash's discharge was planned for that same afternoon. [SMF ¶36] When meeting with WPB VAMC staff that morning, Mr. Dash explained that he planned to stop at his marital home and pick up his things and his younger son, N.D., before going to New York – a change from his expressed plans the prior day. [SMF ¶37, 38] Given his changed plans as it related to his son and

the circumstances that led to his admission to the WPB VAMC a few days earlier, staff at the hospital discussed with Mr. Dash their desire to speak with Mr. Dash's wife before finalizing Mr. Dash's discharge. [SMF ¶46-47, 49] By that time, Mr. Dash had still not signed a release of information for his wife, as he had for his mother. [SMF ¶49]

Social workers at the WPB VAMC made several efforts to contact Emma Dash prior to the afternoon of March 14, 2019 but were unsuccessful until the afternoon. [SMF ¶¶ 51-54] Mr. Dash was then informed that his discharge would be delayed until the following day. [SMF ¶56, 57] In the afternoon of March 14, 2019, CNA Nacole Key was assigned to perform 15-minute rounds for Mr. Dash. [SMF ¶59] As reflected on the Patient Observation Level Checklist, Ms. Key noted that Mr. Dash was in his room when she visually observed him for each of the 15-minute intervals, including the entries for 5:30 p.m. and 5:45 p.m. [SMF ¶59, 63] At 5:45 p.m., CNA Key saw and spoke to Mr. Dash. [SMF ¶63] At approximately 6:00 p.m., Mr. Dash was discovered unresponsive with a ligature lied around his neck. [SMF ¶66] Resuscitation and lifesaving measures were undertaken, but Mr. Dash was later pronounced dead. [SMF ¶68]. Mr. Dash's autopsy listed his cause of death as "hanging" and manner of death "suicide." [SMF ¶68]

### c.  Procedural History

Plaintiffs submitted their respective "Standard Form 95 – Claim for Injury, Damage, or Death" (the "Administrative Claim") to the VA, which were all ultimately denied. [SMF ¶69] Each Administrative Claim listed an identical basis for alleged liability. In their Administrative Claims, Plaintiffs relied heavily on a report prepared by VA Office of Inspector General, published August 2019 (the "VA OIG Report")[1]. On January 5, 2022, Plaintiffs filed their Complaint alleging

---

[1] It is unclear why Plaintiffs submitted separate Administrative Claims. Eleventh Circuit and district court precedent clarify that such an action can only be brought by the personal

negligence pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2674 *et seq.*, and Florida's Wrongful Death Statute, Fla. Stat § 768.21 *et. seq.* Plaintiffs' wrongful death claim is premised upon their allegation that the care received by Mr. Dash at the WPB VAMC inpatient psychiatric unit fell below the standard of care.

Plaintiffs list the alleged nine "breaches" of the standard of care in their Complaint. *See* Compl. ¶ 25(a)-(*i*). The crux of Plaintiffs' alleged acts constituting medical negligence center on what they claim was the failure of WPB VAMC staff to properly perform the "15-minute safety rounds" and that security cameras to monitor patients in Unit 3C were non-functional. *See* Compl. ¶ 25(a)-(d). Defendant is concurrently filing a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction as the discretionary function exception to the FTCA disposes of Plaintiffs' theories of liability regarding the environment of care, and risk mitigation strategies.

Defendant filed its Answer to Plaintiffs' Complaint on March 16, 2022. *See* Ans., D.E. 16. Plaintiffs have not amended their Complaint to include any new theories of liability.[2]

## III.    STANDARD OF REVIEW

Under Rule 56, summary judgment is warranted when, in viewing the pleadings, depositions, answers to interrogatories, admissions on file, and the evidence in general in the light most favorable to the non-movant, the Court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992); *Globecon Group, LLC*

---

representative of the decedent on behalf of survivors, and survivors do not have individual claims. Defendant addresses this issue in detail in its concurrently filed motion to dismiss for lack of subject matter jurisdiction.

[2] Defendant does not consent to any attempt by Plaintiffs to try unpled issues on liability. *See Affiliati Network, Inc. v. Wanamaker*, 1:16-CV-24097-UU, 2017 WL 8784851, at *5 (S.D. Fla. Aug. 22, 2017) (internal citations omitted).

*v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). Factual disputes will only defeat a motion for summary judgment when those factual disputes are material or relevant to the actual issues before the court. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis original). Indeed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Factual disputes are only "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Marler v. U-Store-It Mini Warehouse Co.*, 09-60613-CIV, 2010 WL 11506367, at *3 (S.D. Fla. July 20, 2010), *aff'd,* 416 F. App'x 49 (11th Cir. 2011).

It is settled law that, in opposing a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). Rather, "[T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 586-87 (emphasis in original). Importantly, the non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252. "For factual issues to be considered genuine, they must have a real basis in the record ... mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted); *see Hawthorne v. United States*, 9:18-CV-80508, 2019 WL 1466741, at \*5 (S.D. Fla. Feb. 21, 2019), *report and recommendation adopted*, 9:18-CV-80508, 2019 WL 1466476 (S.D. Fla. Mar. 12, 2019) ("[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.") (citation omitted).

## IV.    ARGUMENT

Plaintiffs cannot satisfy the elements of medical negligence under Florida law. In FTCA cases such as this, the Court is to determine liability by applying the appropriate law of the forum state. 28 U.S.C. §§ 1346(b), 2674; *see Massey v. United States*, 733 F.2d 760 (11th Cir. 1984). "In Florida, traditional negligence requires proof of four elements: (1) duty of care; (2) breach; (3) legal or proximate causation; and (4) actual damages." *Poltorak v. Ferrell*, No. 16-81832-CIV, 2018 WL 1718688, at \*3 (S.D. Fla. Jan. 4, 2018) (citing *Wallace v. Dean*, 3 So.3d 1035, 1047 (Fla. 2009)). As Plaintiffs' claims are pled and premised upon theories of medical malpractice, Plaintiffs must also establish "the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." *Whittaker v. Sanchez*, No. 19-13486, 2021 WL 4495808, at \*3 (11th Cir. Oct. 1, 2021) (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)); Section 766.102(1), Fla. Stat.).

Florida law defines the standard of care as follows:

The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

Section 766.102(1), Fla. Stat. (2022). "In medical malpractice cases, the standard of care is determined by a consideration of expert testimony." *Whittaker*, 2021 WL 4495808, at \*3 (citing

*Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995)). This is due to the "specialized knowledge necessary to show what a 'reasonably prudent' physician would consider 'acceptable and appropriate'[.]" *Jerrett v. United States*, [need case No.], 2022 WL 599200, at *2 (M.D. Fla. Feb. 11, 2022) (citing *Pate* and *Chirillo v. Granicz*, 199 So. 3d 246, 252 (Fla. 2016)). "Where a plaintiff in a medical negligence action does not establish what standard of care existed under the circumstances of the case, and therefore is unable to show a breach of such care, a directed verdict is appropriate." *Id.* (quoting *Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981). If a defendant shows that a plaintiff is unable to present evidence of the negligence alleged in the complaint, then no genuine issue of material fact exists and summary judgment may be granted in favor of the defendant. *Id.* (citing *Sims v. Helms*, 345 So. 2d 721, 724 (Fla. 1977)).

### A.  As a Threshold Matter, Plaintiffs Do Not Have a Qualified Expert Witness to Opine on the Relevant Applicable Standard of Care for the Specific Theories Pled in Their Complaint.

Plaintiffs disclosed Steven Bruce, Ph.D., as their proffered expert witness for the standard of care. Dr. Bruce is not qualified to opine on the relevant standard of care for the specific breaches Plaintiffs allege in the Complaint, nor are his opinions helpful to the Court in this matter when they are legally insufficient.[3] Therefore, Defendant necessarily prevails as a matter of law when Plaintiffs cannot establish the most basic element of medical negligence, the applicable standard of care, in the absence of qualified and reliable expert testimony.

---

[3] Defendant is contemporaneously filing a motion to exclude Dr. Bruce's opinions and testimony at trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. Defendant's motion elaborates on Dr. Bruce's lack of qualifications to opine on the standard of care and the precise issues pled in Plaintiffs' Complaint, as well as the unhelpfulness and unreliability of his opinions.

**B.  Plaintiffs Cannot Establish a Breach of the Standard of Care for the Theories
of Medical Malpractice Alleged in their Complaint.**

Plaintiffs cannot submit evidence of the specific breaches of the standard of care alleged in their Complaint. Therefore, Plaintiffs cannot establish a breach of the standard of care for the specific theories alleged in the Complaint. *See* D.E. 1, Compl., ¶ 25.

i.  The undisputed facts show that the 15-minute rounds were completed by WPB VAMC staff on March 14, 2019 and met the standard of care.

Perhaps the most critical allegation in Plaintiffs' Complaint is that Nacole Key, the certified nursing assistant responsible for Mr. Dash's 15-minute rounds on the afternoon of March 14, 2019, did not satisfy the standard of care for completion of the 15-minute rounds for Mr. Dash. Specifically, Plaintiffs allege: (i) "the method by which mental health staff conducted and documented patient observation rounds failed to ensure Decedent Dash's safety" (Compl. ¶ 25(a)); (ii) [Nacole Key] "was assigned to perform other duties during that time in violation of Unit 3C protocol" (Compl. ¶ 25(b); and (iii) that staff failed to perform the 15-minute rounds and made "false entries" on the Patient Observation Level Checklist (Compl., ¶ 25(c)). The undisputed facts and expert opinions show the opposite: the 15-minute rounds completed on the afternoon of March 14, 2019 by Nacole Key were performed and satisfied the standard of care. [SMF ¶¶ 59-65]

The documentation for Mr. Dash's 15-minute rounds on March 14, 2019 are reflected on the Patient Observation Level Checklist in his medical records. [SMF ¶59] There are four separate checklists for each day of Mr. Dash's admission in Unit 3C. [SMF ¶¶ 21-23, 59] On March 14, 2019, beginning at 2:00 p.m. and for every 15-minute interval thereafter that afternoon, Nacole Key signed her initials and noted that she observed Mr. Dash for each of those 15-minute intervals. [SMF ¶59] Most importantly, Nacole Key testified that she saw Mr. Dash at 5:45 p.m., within the 15 minutes prior to his discovery as unresponsive at approximately 6:00 p.m. [SMF ¶63] As

reflected in Mr. Dash's medical records, Dana Montada, a registered nurse, confirmed that Nacole Key actually saw Mr. Dash at 5:30 p.m. and 5:45 p.m. [SMF ¶¶ 63-65]

Plaintiffs cannot point to any credible, reliable evidence, aside from their own speculation, that Nacole Key did not perform any of these 15-minute rounds, that any of the 15-minute rounds did not occur as noted, or, most significantly, that any notations in Mr. Dash's medical records or 15-minute round form were falsified. On the contrary, where the evidence shows that the 15-minute checks were performed, the Court should reject Plaintiffs' unsupported theories. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

ii.   <u>Plaintiffs' expert witness cannot establish that the 15-minute rounds breached the standard of care.</u>

Foundationally, Plaintiffs have no qualified expert witness to opine on the standard of care for the 15-minute rounds. Dr. Bruce is not qualified to opine on the routine in an inpatient mental health clinic, as Defendant outlines in its corresponding *Daubert* motion regarding Dr. Bruce.

Further fatal to Plaintiffs' theories is that Dr. Bruce had a legally insufficient opinion on the standard of care for compliance with the 15-minute rounds. When asked if the standard of care was violated if staff did not enter Mr. Dash's room for his 15-minute rounds, Dr. Bruce opined that if staff could visually see Mr. Dash, even if they did not enter his room, "that is altogether different than knowing that the person's door was closed and not going in the room to document what was happening during those checks." [*See* SMF ¶ 70] Dr. Bruce then based his opinions on his belief that the nursing assistant did not enter Mr. Dash's room specifically at 5:45 p.m. [SMF ¶ 72] When asked if his opinion turns on whether the nursing assistant visually saw Mr. Dash

during a 15-minute round, Dr. Bruce opined, "that is one part of it…". [SMF ¶ 71] On the contrary, the evidence confirms that Nacole Key did visually observe Mr. Dash at 5:45 p.m. Dr. Bruce's opinion that she did not enter his room is not supported by the evidence and not supportive of a violation of the standard of care. Without more, there is no dispute that WPB VAMC employees met the standard of care as it relates to the 15-minute rounds for Mr. Dash.

Dr. Richard Elliott, Defendant's proffered expert witness for the standard of care, has held, among his other credentials, numerous senior administrative positions at several large mental health hospitals, including CEO, Chief Medical Officer, Medical Director, Clinical Director, etc. *See* Elliot Decl., Ex. A at p. 1. Dr. Elliott opined that the standard of care was met regarding the 15-minute rounds when Nacole Key both saw and spoke to Mr. Dash at 5:45 p.m., as confirmed by the medical records and her testimony. *Id.*, p. 21. In Dr. Elliott's opinion, "The most important part of the 15-minute checks is that they are conducted with the patient….Thus, the standard of care was met." *Id.* Given the evidence that Nacole Key both saw and spoke to Mr. Dash at 5:45 p.m., there is no reasonable dispute that the standard of care was met in this regard. Defendant is entitled to judgment as a matter of law as a result.

Defendant anticipates that Plaintiffs will argue that Nacole Key separately violated the standard of care for 15-minute rounds by conducting a blood draw on another patient *after* she completed her 5:45 p.m. check of Mr. Dash but *prior* to Mr. Dash's discovery at approximately 6:00 p.m. Plaintiffs' argument and associated allegations are unavailing and insufficient to establish a violation of the applicable standard of care. Again, Dr. Bruce is not qualified to offer an opinion in this regard if he even sufficiently does so. Nevertheless, Ms. Key explained that she is able to draw blood from a nearby patient in no more than five minutes. Dr. Elliott opined that prohibiting staff from participating in other tasks while they also conduct 15-minute rounds is not

the standard of care. *See* Elliot Decl., Ex. A at p. 21; Elliott Decl., Ex. B, Dep., 71:19-72:22. This is particularly true where the blood draw did not interfere with her duties or her 15-minute round for Mr. Dash at 5:45 p.m. *Id.* Whether additional tasks interfere with the observation rounds or prevent the observation rounds from occurring at all or within the designated timeframes is the most important consideration in this matter. *Id.* There is no evidence to suggest that any such interference occurred in this matter, and Dr. Elliott opined the same. Without more, and given the undisputed facts, Defendant is entitled to summary judgment on this allegation.

   iii.  <u>Plaintiffs' expert witness cannot establish that the timeline for contact with the decedent's wife violated any standard of care.</u>

  Plaintiffs' only theory of liability not explicitly derived from the VA OIG report is Plaintiffs' theory that staff at the WPB VAMC violated the standard of care "because they did not contact [Emma Dash] in a timely fashion to discuss discharge planning and obtain clinically appropriate collateral information." *See* D.E. 1, Compl., ¶ 22(m), 25(i). To prove this allegation, Plaintiffs must again rely upon the opinions of Dr. Bruce. Dr. Bruce' use of the term "timely fashion" is insufficient to define the standard of care or establish a breach of it.

  When asked what the standard of care for inpatient psychiatry discharge planning required for contacting collateral source of information such as Emma Dash, Dr. Bruce first testified, "I know what you need to do is discuss the discharge with the patient first. I think that they asked to -- asked him if they could contact Mrs. Dash and I think he refused initially." [SMF ¶73, 74] There is no dispute that Mr. Dash refused to give permission to staff to contact his wife when he arrived at the WPB VAMC on March 11, 2019. [SMF ¶¶ 24-25, 49] Indeed, there is no dispute that staff contacted his mother only after he signed a release of information for staff to do so. [SMF ¶33, 35]

  When Dr. Bruce was further asked to state what this "timely fashion" was required to be pursuant to the standard of care, Dr. Bruce testified, "I don't know that there is specific language

about timely fashion and standard of care other than clinical judgment…". [SMF ¶74] When asked what the specific timeframe should have been for contacting someone related to discharge of a patient from the inpatient unit, Dr. Bruce testified, "Yeah. I don't know that you can put a specific number on it…" *Id.* Put simply, Dr. Bruce opines that the standard of care was violated by not contacting until March 14th but cannot define what it required staff to do before then.  Defendant is entitled to summary judgment on this basis alone. *Whittaker*, 2021 WL 4495808, at *3 (affirming summary judgment where plaintiff "did not present any expert medical testimony to establish the standard of care that FCC Coleman owed him, so he was unable to show that FCC Coleman breached any standard of care, and, as a result, was unable to establish the elements of medical malpractice").

The crux of Dr. Bruce's opinion for this allegation is "why wait?" – "if the plan was made three days prior and they knew he was going to be discharged on the 14th, why wait until the 14th in the afternoon to have a conversation with Ms. Dash?" [SMF ¶74] "Why wait" is not a legal standard, nor is it the standard of care, especially in light of HIPAA and other considerations as Dr. Elliott testified to. *See* Elliott Decl., Ex. B, Dep., 10:11-12:12, 17:7-18:7. Dr. Bruce says nothing about consent, the legal requirements surrounding it, or the legal requirements surrounding privacy considerations, HIPAA, etc. in his opinions.

As reflected in Mr. Dash's medical records, the only time Mr. Dash ever signed a release of information form was for his mother on March 13, 2019, and social workers did not contact her until after Mr. Dash signed this release. [SMF ¶33, 35] Once staff was preparing to finalize Mr. Dash's discharge from the inpatient unit and recognized that his plans had changed, staff discussed with Mr. Dash their desire to speak with Mr. Dash's wife before finalizing Mr. Dash's discharge.

[SMF ¶¶ 46-49] Once they did so, social workers made numerous efforts to contact Emma Dash through telephone calls and text messages prior to the afternoon. [SMF ¶¶ 51-55]

Dr. Elliott opined that, even in consideration of the constraints of HIPAA, WPB VAMC staff acted reasonably and within the standard of care when they made efforts to contact Emma Dash on March 14, 2019, particularly after speaking to Mr. Dash and considering his wishes, privacy rights, and the importance of developing a trusting, therapeutic relationship with him. *See* Elliott Decl., Ex. B, Dep. 20:21-22:1, 32:2-34:14.   Dr. Bruce's opinions ignore these most important points and fail to establish what the standard of care requires for such contact in light of these points. For the Court to find in Plaintiffs' favor on this allegation, the Court would necessarily have to find that staff at the WPB VAMC should have knowingly violated their patient's rights and their patient's explicit wishes and contacted his wife prior to March 14, 2019. There is no basis to do so based upon the standard of care. Defendant is entitled to judgment in its favor.

### C.   Plaintiffs Cannot Establish the Causal Link between Theories of Liability and Brieux Dash's Death

The Florida Supreme Court set forth the standard for proving proximate cause in *Gooding*. The court quoted Prosser, *Law of Torts* § 41 (4th ed.1971) and wrote, "On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gooding*, 445 So.2d at 1018). The Eleventh Circuit has written similarly. *Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 224 (11th Cir. 2021) ("A plaintiff does not sustain his burden of proof by relying

14

on pure speculation.") (quoting *Cox v. St. Josephs Hosp.*, 71 So. 3d 795, 799 (Fla. 2011)); *Hessen for Use & Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 647 (11th Cir. 1990) ("a mere possibility of causation is not enough").

        i.    <u>Plaintiffs' arguments regarding the 15-minute rounds, documentation, and other tasks performed fail to establish the requisite causal link.</u>

Defendant anticipates that Plaintiffs will argument that the mere fact that the 15-minute round form was not fully completed breached the standard of care in this matter. Again, in Dr. Elliott's opinion, "The most important part of the 15-minute checks is that they are conducted with the patient….Thus, the standard of care was met." *See* Elliott Decl., Ex. A. p. 21. Dr. Elliott explained further that the mere failure to fully complete the 15-minute form, or other documents, is not a breach of the standard of care. In his opinion, "Reasonable practitioners don't always document things contemporaneously. Sometimes they don't document things perfectly. That has very little to do with the standard of care." *See* Elliott Decl., Ex. B, Dep., 59:15-60:9.

But more importantly, there is no evidence that incomplete documentation of the 15-minute rounds, standing alone, had any causal effect on Mr. Dash's death when the rounds were performed within the standard of care. The same analysis applies to the blood draws that Ms. Key performed *after* she completed her 15-minute round for Mr. Dash at 5:45 p.m. and *before* 6:00 p.m. when he was discovered unresponsive. There is no evidence to suggest that Ms. Key's blood draw had any causal effect on Mr. Dash's death when the rounds were performed within the standard of care. The same analysis applies to Plaintiffs' theory regarding any "process of oversight regarding the correct implementation, validity or accuracy of the 15-minute pre-printed check forms or process". *See* Compl., ¶ 25(a)). There is no evidence to suggest that any such oversight breached the standard of care or had any causal effect on Mr. Dash's death.

       ii.   <u>Plaintiffs do not have any expert testimony on the security cameras or "unified treatment plan" to establish any breach of the standard of care or the requisite causal link with Mr. Dash's death.</u>

In addition to their failure to establish a breach of the standard of care applicable in this case as it relates to the 15-minute rounds, Plaintiffs also cannot, as a matter of law, establish any breach of any standard of care or the requisite causal link to Mr. Dash's death for any of their remaining theories of medical malpractice in their Complaint. Plaintiffs cannot establish that the lack of operational security cameras in the hallways of Unit 3C at the WPB VAMC in March 2019 made it more probable than not that staff would have intervened and prevented Mr. Dash's death. *See* D.E. 1, Compl., ¶ 25(d). Plaintiffs also rely on cursory testimony to support their claim that a "unified treatment plan" would have prevented Mr. Dash's death. *Id.*, ¶ 25(h).[4]

       i.   <u>Security Cameras</u>

Plaintiffs allege that if security cameras in Unit 3C were operational in March 2019, these cameras would have led to the prevention of Mr. Dash's death.  *Id.*, ¶ 25(*i*). In order to establish this claim, Plaintiffs would impermissibly need to rely on several speculative, unreasonable inferences. An inference is only reasonable if it is one that a reasonable and fair-minded person in the exercise of impartial judgment might draw from the evidence. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). However, an "inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* at 1324 (quotation marks omitted). The latter is the case here.

---

[4] As it relates to claims that non-compliance with certain policies or protocols at the WPB VAMC were the but-for cause of Mr. Dash's death (*see* D.E. 1, Compl., ¶¶ 25(f), 25(g)), these are easily disposed of by Dr. Elliott's opinion within a reasonable degree of medical certainty where he concluded the administrative shortcomings did not violate the standard of care, especially as it relates to the clinical treatment and care that was provided, and did not cause or contribute to Mr. Dash's death. *See* Elliott Decl. Ex. A p. 23.

Defendant does not dispute that a camera was installed in the hallway proximate to Mr. Dash's bedroom and it was not operable on the day Mr. Dash died. [SMF ¶4-5] Indeed, none of the cameras that had been installed in Unit 3C at that time were operational because of limited server capacity at the facility. [SMF ¶5] Though one could certainly speculate that, had any cameras been operable, staff on Unit 3C *may* have observed Mr. Dash in some manner and *may* have been able to intervene in some manner. However, there is no evidence beyond such impermissible speculation that any such real-time intervention was guaranteed or even more likely than not, and Plaintiffs cannot sufficiently establish otherwise.

Indeed, had the camera been operable, the camera would have been monitored by VA Police at their dispatch office and among the dozens, if not hundreds, of other cameras covering the entire WPB VAMC. [SMF ¶7] Aside from the sheer number of other cameras to monitor for security purposes, Plaintiffs must establish that the closing of a bedroom door or any other action would have been observed in real-time and drawn the attention of the VA Police. Plaintiffs must establish that VA Police would also have considered this action an act warranting an emergency response of some time, as opposed to a routine matter to staff that a door had closed, for instance. Bedroom doors in Unit 3C are allowed to be closed by patients. [SMF ¶3] Therefore, Plaintiffs' contention that if the cameras had been operational, Mr. Dash's death would have been prevented is simply a speculative position that requires too many unreasonable inferences and leaps of logic for Plaintiffs to carry their burden. Plaintiffs cannot create a genuine issue of material fact sufficient to prevent judgment in favor of Defendant on this issue.

Furthermore, Dr. Bruce's opinion in this regard only noted it is "possible" operational cameras may have permitted intervention before Mr. Dash's death. [*See* SMF¶ 76] "Possible" is insufficient as a matter of law and his "opinion" should not be considered by the Court. *See, e.g.,*

*Lees v. Carthage College*, 714 F.3d 516, 526 (7th Cir. 2013) (affirming preclusion of proffered expert testimony on premises security when expert planned to testify on how lack of security cameras in college dormitory led to sexual assault of student "when such an analysis is theoretically possible but, on the present record, the expert's report lacked sufficient analysis tied to experiential data about the use of these practices in college residence halls to be admissible.")

On the contrary, Dr. Elliott, with his extensive experience working in and supervising inpatient psychiatric facilities and as a surveyor and faculty member for the Joint Commission on Accreditation of Health Care Organization (JCAHO), opined that many inpatient psychiatric units do not even have any type of cameras installed and did not in 2019. *See* Elliott Decl., Ex. A p. 1, 2, 20. The cameras installed in March 2019 were not designed to monitor patients or view into their bedrooms, but to maintain overall security of the exit points. [*See* SMF ¶5] In the absence of logically flowing expert testimony, Plaintiffs cannot prove breach, nor causation on this point.

ii.  Single Unifying Treatment Plan

Plaintiffs further allege that a "lack of a single unifying treatment plan" is evidence for substandard care for Mr. Dash.  *See* D.E. 1, Compl., ¶ 25(h). Dr. Bruce parroted this allegation from the VA OIG Report but did not cite any deficiency in the actual standard of care provided, other than to suggest that the staff generally "were not on the same page because there wasn't a document talking about what the overall treatment plan was for him". [SMF ¶77] There is nothing to support this "same page" assertion factually in Mr. Dash's care or in the standard of care. As explained by Dr. Elliott, historically, a written treatment plan has become accepted even though few clinicians consult this type of documentation on any regular basis. *See* Elliot Decl., Ex. A. at p.23. Instead, frequent communication between clinicians is more common and appropriate, as is the case with Mr. Dash's care. *Id.* On an inpatient psychiatric unit, treatment can change daily and

18

written treatment plans, which were more appropriate and useful when the average length of stay was months, become outdated very quickly. *Id.*

Dr. Elliott concluded that the "lack of a single unifying treatment plan" is an outdated approach and did not violate the standard of care, did not cause Mr. Dash's death, and would not have made a significant difference in the outcome at that time.  There is no basis in the evidence to find or speculate otherwise. Considering Mr. Dash's extensive medical records during his March 2019 admission and Dr. Elliott's opinion, there is no reasonable dispute that the medical staff documented numerous notes for Mr. Dash each day throughout his admission in March 2019 and were regularly communicating with one another throughout his admission. *Id.* Therefore, Defendant is entitled to judgment on this point as a matter of law.

### iii.   Lack of ISIT or MHEOCC Training

Plaintiffs point to the staffing of an Interdisciplinary Safety Inspection Team and allege that the WPB VAMC "failed to meet VHA requirements for staffing an Interdisciplinary Safety Inspection Team (ISIT)". *See* D.E. 1, Compl., ¶ 25(f). Plaintiffs also allege that the WPB VAMC failed to meet specific staff training requirements for the Mental Health Environment of Care Checklist ("MHEOCC"). *Id.*, ¶ 25(g). Even if true, there is no evidence beyond mere speculation that any lack of formally recognized ISIT or certain training on the Mental Health Environment of Care Checklist for certain individuals is causally related to Mr. Dash's death.

In general, Plaintiffs ask the Court to consider alternative scenarios where Mr. Dash's death could have been prevented and then simply attribute fault to Defendant. To do so without reliable and admissible evidence and support is improper under the law and prejudices defendants in general in the defense of their cases. *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (stating that inferences based upon speculation are not reasonable). This rule against

stacking inferences "protect[s] litigants from verdicts based on conjecture and speculation." *Id.* (quoting *Zota*, 192 So. 3d at 537). Here, Defendants have established that the standard of care for Mr. Dash's treatment at WPB VAMC was met through the undisputed material facts and the opinions of its qualified expert witness.  Therefore, Defendant is entitled to judgment in its favor on Plaintiff's Complaint and the specifically delineated allegations within it.[5]

## **CONCLUSION**

Defendant is entitled to judgment as a matter of law on Plaintiffs' sole claim relating to the alleged wrongful death of Brieux Dash at the WPB VAMC. None of the nine theories outlined specifically in Plaintiffs' Complaint are a breach of the standard of care for inpatient mental health treatment. Plaintiffs' disclosed expert witness is not qualified to render any opinions on the standards of care at issue in this case. In contrast, Dr. Elliott is qualified to render opinions on the standard of care appliable to WPB VAMC and opined there were no such violations.  Dr. Elliott's opinions are supported by the undisputed material facts identified by Defendant in its accompanying Statement of Material Facts. Plaintiffs can only offer speculative inferences to the contrary, inferences that are insufficient to preclude the entry of summary judgment.

Therefore, Defendant respectfully request that the Court enter judgment in its favor on the claim asserted in Plaintiffs' Complaint, and any other such relief it deems just and proper, including its costs.

---

[5] For Plaintiffs' theories not directly addressed by this Motion, Defendant refers the Court to its contemporaneously filed Motion to Dismiss for Lack of Subject Matter Jurisdiction and submits that any other such claims are subject to dismissal under the discretionary function exception to the FTCA.

Dated: August 25, 2022                         Respectfully submitted,

                                        **JUAN ANTONIO GONZALEZ**
                                        **UNITED STATES ATTORNEY**

By:     *Frank A. DeLuccia   /s/*
               **Frank A. DeLuccia**
               Assistant United States Attorney
               Federal Bar No. A5502695
               **Latoya C. Brown**
               Assistant United States Attorney
               Florida Bar No. 105768
               United States Attorney's Office
               500 E. Broward Blvd., Suite 700
               Ft. Lauderdale, FL 33394
               Tel: (954) 660-5672
               Email: Frank.DeLuccia@usdoj.gov
               Email: Latoya.Brown2@usdoj.gov

               *Counsel for Defendant United States*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on August 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, whereupon it was served onto all counsel of record.

               *Frank A. DeLuccia   /s/*
               FRANK A. DELUCCIA
               ASSISTANT U.S. ATTORNEY