# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-80015-CIV-MIDDLEBROOKS/MATTHEWMAN

EMMA DASH, as Personal Representative
for the Estate of Brieux Dash,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

_____/

### [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Emma Dash, as Personal Representative of the Estate of Brieux Dash, brought this wrongful death action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671, *et seq.*, I held a bench trial at which the Parties presented documentary and testimonial evidence. Upon careful consideration of the entire record, including the evidence adduced at trial, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

This case concerns the suicide of Brieux Dash, a U.S. Army veteran, while he was a patient at the West Palm Beach Veterans Affairs Medical Center ("WPB VAMC") on March 14, 2019. Mr. Dash was receiving treatment at WPB VAMC after he was admitted on March 11, 2019, under Florida's Baker Act,[1] upon being deemed a danger to himself.[2] For the reasons discussed, the Court finds Plaintiff has not proven the elements of her cause of action, and enter judgment in favor of Defendant, United States of America.

---

[1] The Florida Mental Health Act, §§ 394.451-394.47892, Fla. Stat., also known as "The Baker Act".
[2] D-001, DEF000209; D-003

## I.      THE COURT FINDS DEFENDANT IS NOT LIABLE

### a.  Introduction of the Plaintiff and Survivors

Mr. Dash was born on January 31, 1986, in New York, to Shenita Nelson and Bruce Dash. Mr. Dash was married to Emma Dash, with whom he had two children, Jada Dash, born in 2002, and B.D. born in 2005.  During his marriage with Emma Dash, Mr. Dash had a relationship with Ms. Waraporn Chomchuen while he was stationed in Germany, and a child, N.D., was born of that relationship in 2015.  Ms. Chomchuen and N.D. currently reside in Germany.  Emma Dash, Jada Dash, B.D., and N.D. are the survivors of Mr. Dash's Estate.[3]   Emma Dash is the personal representative of Mr. Dash's estate.[4]

### b.  Unit 3C at West Palm Beach Veterans Affairs Medical Center

The WPB VAMC has a locked acute inpatient psychiatric unit, referred to as Unit 3C. This unit is an acute, short-term stabilization program for veterans in acute mental health distress.[5] The treatment provided in Unit 3C is veteran-centered and aligned with the mental health recovery model to help stabilize a veteran from the symptoms they presented with upon admission.[6] Veterans have input into their treatment plans on the inpatient psychiatric unit, and there is no typical time for discharge from the unit.[7]

---

[3] *See* D.E. 123
[4] D-013
[5] *See* Reoyo Dep., 113:12-25. References to prior deposition testimony for certain witnesses is provided simply for reference as Defendant anticipates all witnesses will testify consistently with their prior deposition testimony.
[6] D-013
[7] D-013



Critical to the resolution of this case, the WPB VAMC's inpatient psychiatric unit has a baseline 15-minute rounding protocol for all patients.[9]  According to the WPB VAMC's 15-minute rounding protocol, all patients on the inpatient psychiatric unit are to be checked every 15 minutes while the patients are present on the unit, unless indicated otherwise.[10] WPB VAMC's 15-minute rounding protocol is typically conducted by nursing assistants.[11]  When conducting the WPB VAMC's 15-minute rounding protocol, the nursing assistant uses a pre-printed checklist form (titled, "Patient Observation Level Checklist") to document the 15-minute rounds for each patient.[12] When conducting the WPB VAMC's 15-minute rounding protocol, the nursing assistant is to document on a the form a code for the location of a patient at the time of the check, and a code for the behavior (or activity) of a patient at the time of the check. [13] Prior to March 2019, no

---

[8] D-009
[9] D-012
[10] D-012
[11] D-012
[12] D-002; D-012
[13] D-002; D-012

WPB VAMC written policy prohibited nursing assistants from performing other tasks while performing 15-minute rounds.[14]

### c. Brieux Dash's Treatment at WPB VAMC in March 2019

Based on a medical progress note timed at 2:45 A.M., Mr. Dash was brought to the emergency department at WPB VAMC by Palm Springs police officers on March 11, 2019[15] after Emma Dash called police  claiming Mr. Dash was threatening to hang himself.[16]  Police officers noted Mr. Dash was angry about marital issues and suspected his wife of having an extramarital affair. Mr. Dash claimed that Emma Dash was refusing to talk to him, and also claimed she was simply trying to get him out of the house after a dispute.[17]  Upon arrival at the emergency department, Mr. Dash was visibly agitated and angry, but denied any current suicidal or homicidal thoughts.[18]  Mr. Dash admitted to emergency department staff that he had 5 beers since the afternoon of March 10, 2019, and that he had been noncompliant with his prescribed medications.[19] By 3:20 A.M., nurses caring for Mr. Dash noted he was calm and cooperative.  The admission note signed at 4:32 A.M. by Dr. Maria Narvasa, a certified psychiatrist, recommended admission under the Baker Act for patient safety and stabilization of depression.[20]

i. Initial Evaluation and Treatment of Mr. Dash --  March 11, 2019 through March 13, 2019

By 4:45 A.M. Mr. Dash was escorted from the emergency department to Unit 3C for admission under the Baker Act.[21]  At no point on that date was Mr. Dash considered a perpetrator

---

[14] *See* Reoyo Dep., 75:13-76:24.
[15] D-001, DEF000216
[16] D-039
[17] D-039
[18] D-001, DEF000216; *see also* DEF000211
[19] D-001, DEF000216
[20] D-001, DEF000209
[21] D-001, DEF000215

of abuse,[22] nor a victim of abuse.[23]  Based on a medical progress note timed 8:13 A.M., Mr. Dash's initial psychiatric evaluation was performed by Dr. Zaida Reoyo, a psychiatrist assigned to Unit 3C.[24]  Dr. Reoyo noted Mr. Dash was alert, and "cooperative with interview, pleasant."[25]  Suicide and homicide ideations were denied.  The note concluded with "SW [social work] exploring support system with family in order to provide a safe discharge plan."[26]  Dr. Reoyo did have several notes about Mr. Dash's current tumultuous relationship with his wife, including an alleged affair, and Mr. Dash's claim that his admission was a set up by his wife.[27]  Other providers on Mr. Dash's treatment team also met with him that first day in Unit 3C.  Mr. Dash's irritability and marital conflict came up repeatedly with other providers as well.[28]

Based on a medical progress note timed at 11:04 A.M., Melina Goldenberg, Psy.D. a psychologist on the "Suicide Prevention Team," entered a note which flagged for providers that Mr. Dash was a high risk for suicide.[29] Mr. Dash also participated in the creation of a safety plan which would be confirmed at discharge.  Mr. Dash refused any family participation in the creation of the safety plan.[30]  Based on a medical progress noted timed at 11:14 A.M., Elizabeth Goldberg, a licensed social worker assigned to Unit 3C met with Mr. Dash in his room for his initial social work assessment.[31]  Mr. Dash refused to sign a release of information form, and "declined all friend/family involvement in care coordination/discharge planning."[32]  Ms. Goldberg was able to

---

[22] D-001, DEF000202
[23] D-001, DEF000214
[24] D-001, DEF000194-196
[25] D-001, DEF000195
[26] D-001, DEF000196
[27] D-001, DEF000194-196
[28] D-001, DEF000190
[29] D-001, DEF000159
[30] D-001, DEF000159
[31] D-001, DEF000183-188
[32] D-001, DEF000185

confirm his primary next of kin to be Shenita Nelson, his mother.[33]   According to a medical progress note timed a few minutes later, Mr. Dash was visited by another social worker, Elizabeth Hausfeld, who worked in transitional care management.[34]   During this visit, Mr. Dash again reported the dispute with Emma Dash that led to his admission, as well has other life stressors he was experiencing.[35]   One in particular was a letter from the VA about an overpayment of separation pay, for which social work provided specific support and guidance and a vocational rehabilitation consultation for job assistance.[36]   Ms. Hausfeld's impression was that Mr. Dash was alert but depressed.[37] Based on a medical progress noted timed at 2:15 P.M., Mr. Dash had a comprehensive physical examination by Marjorie Gillespie, ARNP, and signed off by Dr. Reoyo, shortly after. Nurse Gillespie also administered a comprehensive suicide risk evaluation.[38]   Mr. Dash also met with a vocational development specialist around 3:30 P.M.[39] Mr. Dash spent the evening in his room, and was found to be calm, cooperative and receptive to care.[40]   The evening was uneventful, and Mr. Dash slept throughout the night.[41]

On March 12, 2019, based on a medical progress note timed at 11:35 A.M., Mr. Dash was evaluated by Andre Vilme, RN.  Andre Vilme noted that patient appears less irritable and is talking on the phone with family members.[42]   Mr. Dash was taking Vistaryl[43] with good results, but

---

[33] D-001, DEF000185
[34] D-001, DEF000182-183
[35] D-001, DEF000182-183
[36] D-001, DEF 000187-000188
[37] D-001, DEF000182-183
[38] D-001, DEF000168-169
[39] D-001, DEF000168
[40] D-001, DEF000192
[41] D-001, DEF000168
[42] D-001, DEF000166
[43] Vistaryl is a medication used to treat symptoms of anxiety. *See* Montada Dep., 166:11-13.

declined to take Depakote.[44] Next, Mr. Dash saw Dr. Reoyo, as reflected in the psychiatry progress note.  In this note, Dr. Reoyo noted that "[s]ocial work exploring a plan for safe discharge with his collaterals."[45] After meeting with Dr. Reoyo, Mr. Dash had a meeting with Dr. Goldenberg to discuss his Suicide Prevention Safety Plan.  Notably, the only family member Mr. Dash included in his plan was his mother, and he declined to designate a safety contact.[46] At approximately 3:00 P.M., Mr. Dash had a group session with other patients led by Paul Milkewski, recreational therapist.[47]   There was another session at 6:00 P.M. for leisure skills group led by Nancy Pietrobono, recreational therapist.[48]  Mr. Dash was in the day room watching TV with fellow patients between 7:00 P.M. and 9:00 P.M., but otherwise remained in his room.[49] At night, Mr. Dash requested medicine to sleep, which was given.  Mr. Dash slept through the night.[50]

On the morning of March 13, 2019, Mr. Dash was assessed by Dana Montada, RN.  His mood was noted as "flat/depressed", but denied suicide or homicide ideations. [51] At 10:00 A.M., Mr. Dash again attended a group session on the outdoor patio, where Mr. Dash was observed playing solitaire.[52] Mr. Dash participated in a social work group session around 10:45 A.M.[53] Shortly thereafter, Dana Montada noted Mr. Dash was angry that he was not to be discharged that day.  Mr. Dash slammed the door to his room but was redirected without any further incident[54].

---

[44] D-001, DEF000166.  Depatoke is a medication used for mood stabilization and depression. *See* Montada Dep., 111:21-24.
[45] D-001, DEF000160
[46] D-001, DEF000161-165
[47] D-001, DEF000156.  Mr. Dash had also attended a similar session sometime after 10:00 A.M. in the outdoor patio with the same therapist.  D-001, DEF000157
[48] D-001, DEF000155-156
[49] D-001, DEF000154-155
[50] D-001, DEF000155
[51] D-001, DEF000152
[52] D-001, DEF000149
[53] D-001, DEF000150-151
[54] D-001, DEF000152

Dana Montada met with Mr. Dash and spoke with him about how he had acted, and noted he was cooperative, verbalized that he was okay, and was observed to be resting on his bed.[55]

Based on a medical progress noted timed at 3:49 P.M., this same day, Mr. Dash met with the same social worker as before, Elizabeth Goldberg, for a follow-up visit/discharge planning.[56] During this session, Mr. Dash expressed his plan to go home to pick up his belongings and then "immediately leave for Rochester, NY where he will stay with his mother" who, according to him, had already agreed to the plan.   Mr. Dash signed the release of information ("ROI") so Ms. Goldberg, or other social workers, could speak with his mother to confirm.[57]   According to the same note, Mr. Dash reported he planned to take his eldest son with him to New York, and that his wife was agreeable for that son to go.[58]

That afternoon, Mr. Dash met again with Dr. Reoyo.[59] During their meeting, Mr. Dash reported "plans to go to New York and spend some time with his mother, father and sort out what to do about his marriage."[60] Mr. Dash explained he "decided I'm getting all my stuff, which was already packed," as it related to his planned trip to New York.  Dr. Reoyo noted Mr. Dash had signed a ROI for social workers to contact his mother and confirm his plans.[61]   Mr. Dash also inquired about getting off the involuntary admission and was reassured that with "this adequate discharge plan, it is likely, he will be able to sign and also potentially be discharged tomorrow."[62]

---

[55] D-001, DEF 000152, Montada Dep., 114:2-21.
[56] D-001, DEF000143
[57] D-001, DEF000143-144.
[58] D-001, DEF000143
[59] D-001, DEF000146-148
[60] D-001, DEF000148
[61] D-001, DEF000148
[62] D-001, DEF000148

Dr. Reoyo concluded by noting Mr. Dash is "now able to sign for voluntary treatment and considering potential discharge within the next 24-48 hours if no deterioration seen."[63]

> ii.  <u>Mr. Dash's Anticipated Discharge on March 14, 2019 Cancelled When He Changed His Post-Discharge Plans</u>

The next morning on March 14, 2019, at approximately 8:00 A.M., as is the routine for Unit 3C, the morning report meeting was held, and Mr. Dash's treatment discussed among the many individuals involved with the care of patients in Unit 3C.  Mr. Dash's anticipated discharge that same day was also discussed.  At the completion of the meeting, Dr. Reoyo began her rounds, and the other team members dispersed to complete their respective duties.

First, according to a medical progress note timed at 8:36 A.M., Mr. Dash met with Frederick Borowicz, a colleague of Dr. Melina Goldenberg on the Suicide Prevention Team, in order to review the Suicide Prevention Safety Plan prior to discharge.[64]  Mr. Dash was noted as being calm and cooperative and goal-oriented, and had indicated that he was ready for discharge. Mr. Borowicz had noted Mr. Dash's intended plan to go to New York, but this time, in addition to getting his belongings, Mr. Borowicz wrote that Mr. Dash reports "picking up his three year old son and will start travel to New York within a day."[65]

Around the same time Mr. Borowicz met with Mr. Dash, based on a medical progress note timed at 8:37 A.M. on March 14, 2019, Elizabeth Goldberg called Mr. Dash's mother, Shenita Nelson, and in the 8-minute-long phone conversation, confirmed Ms. Nelson agreed to Mr. Dash's plan to come and stay with her upon discharge, and that his son is also welcome to live with her. Ms. Nelson requested Mr. Dash contact her to let her know when he was being discharged.[66]

---

[63] D-001, DEF000148
[64] D-001, DEF000135-136
[65] D-001, DEF000135
[66] D-001, DEF000138

At approximately 10:00 A.M., Mr. Dash met extensively with Dr. Reoyo and Dana Montada, where Mr. Dash signed paperwork to become a voluntary patient on Unit 3C.[67] Next, based on a medical progress note timed at 11:18 A.M., Mr. Dash then met with social worker Elizabeth Goldberg for brief discharge planning meeting where he reported that he had no way to get home from the facility to his car parked at home.[68] Mr. Dash also requested a gas card for his drive up to New York, and Ms. Goldberg noted she would check with her supervisor.[69]  Ms. Goldberg signed this note at 11:24 P.M.

Shortly thereafter, Elizabeth Goldberg spoke with the attending psychiatrist (i.e., Dr. Reoyo) as well as her supervisor, Jennifer Keyes, "to discuss concerns regarding a plan for Mr. Dash to return home to pick up belongings, given the situation at home prior to admission."[70] According to Dr. Reoyo, per the patient's report, Florida's Department of Children and Families ("DCF") was already involved.[71] Therefore, at some point between 11:24 A.M. and 12:21 P.M., Elizabeth Goldberg attempted to contact Emma Dash at her cell phone number (407) 242-6992, but "reached voice mail and left a HIPAA compliant voice message, providing contact information and requesting a call back."[72]  Elizabeth Goldberg next spoke with an agent at DCF to verify whether they were in fact involved, and discuss Mr. Dash's planned discharge and plan to move to New York with his son.[73]  At approximately 12:30 P.M., Elizabeth Goldberg then left for the

---

[67] D-001, DEF000123-000125; D-004
[68] D-001, DEF000126-128
[69] D-001, DEF000126-128
[70] D-001, DEF000128
[71] D-001, DEF000128
[72] D-001, DEF000128
[73] D-001, DEF000128

day, as previously planned, and handed the case off to her supervisor, Jennifer Keyes, to continue to follow up and discharge planning.[74]

Based on a medical progress note timed at 2:00 P.M., Dr. Reoyo indicates she met with Mr. Dash to discuss his new plan post-discharge, and how they may impact his planned discharge. Dr. Reoyo explained that a social worker needed to confirm it was safe to go to his house while his wife is there.[75]   Mr. Dash could not furnish the name of a witness to prevent possible confrontations.[76]   The "issue of him driving to NY with his youngest son with no confirmation about custody/matters was discussed" as requiring clarification.[77]   In one of the meetings included in this note, Dr. Reoyo noted Mr. Dash expressed at some point during the meeting:

> Look, ok you all do what you've got to do, I can't control that, but I only think it's going to complicate the matter, 'cause my wife, she's going to get angrier, and, no, she has no custody of my youngest child[.][78]

According to a medical progress note timed at 1:35 P.M., Jennifer Keyes attempted to contact Emma Dash, but the voicemail box was full.[79]   Therefore, Jennifer Keyes sent a HIPAA compliant text message requesting Emma Dash return her call.   It took approximately three hours before Emma Dash returned Jennifer Keyes's call.  Therefore, Mr. Dash's newly-expressed (but unverified) plan led to the cancellation of his planned discharge for that same day due to concern for the Dash family's safety.

According to Hilair Brice, RN, at some point prior to 2:30 P.M., once Mr. Dash was made aware his discharge was canceled, Mr. Dash became very agitated and upset, and screamed in the

---

[74] D-001, DEF000128
[75] D-001, DEF000125
[76] D-001, DEF000125
[77] D-001, DEF000125
[78] D-001, DEF000124
[79] D-001, DEF000126

day room and hit the wall and his chest.[80] After slamming the door to his room, Mr. Dash then came back out to apologize for his behavior, and expressed that he just wanted to leave to get his things and see his kids.[81]  By 3:00 P.M., Mr. Dash was observed to be lying down quietly in his bed with no outburst noted.[82]  In a medical progress note timed at 3:51 P.M., recreational therapist Nancy Pietrobono noted Mr. Dash declined to participate in the planned group activity where "he was passive and watched the activity."[83]

Mr. Dash was next seen by physician assistant, Tracey Ann Warren, where she noted his mood  was "irritable and agitated. [p]atient was upset about not being able to leave today."[84] In her note signed at 4:30 P.M., Warren noted Mr. Dash was "very emotional and wanted to be left alone. Nursing staff observed and was informed that if he had any complaints or concerns to please notify myself or staff."[85]

At some point around 4:00 P.M., Mr. Dash was heard screaming in his room[86] but it is not clear who, if anyone, actually heard him scream. At the time, Dana Montada and Margarette Dorelien-Beals, RN, visited Mr. Dash in his room to check on him.  Mr. Dash was offered hydroxyzine, but refused.  Mr. Dash expressed "I will be allright [sic], I just wanted to be discharged today[]" before smiling at both providers.[87]  Ms. Beals noted similarly, that Mr. Dash stated "I am alright, I don't need any medication." Dana Montada further noted Mr. Dash was

---

[80] D-001, DEF 000134
[81] D-001, DEF000134
[82] D-001, DEF000134
[83] D-001, DEF000122-123
[84] D-001, DEF000120
[85] D-001, DEF000122
[86] D-001, DEF000135
[87] D-001, DEF000134

observed occasionally using the phone, watching TV in the day room, or napping in his bed.[88]  Mr. Dash also reported being hopeful for discharge tomorrow.[89]

Based on the medical progress note signed at 4:31 P.M., Emma Dash called Jennifer Keyes and provided collateral information, which Ms. Keyes then shared with the treatment team.[90] Since the information recounted by Emma Dash interpersonal violence, Jennifer Keyes documented the content of the conversation in a separate document, known as a Report of Contact.[91]  According to the "Report of Contact" completed by Jennifer Keyes, Emma Dash stated that she did not make up the suicide story to have Mr. Dash admitted, but confirmed marital conflict which led to Mr. Dash's extreme agitation on March 11, 2019.[92]  Emma Dash also confirmed the three year-old son was from a different mother, but she had plans to adopt him in the future.[93]  After speaking with Dr. Reoyo, who confirmed she had already canceled Mr. Dash's planned discharge, Ms. Keyes texted Emma Dash to call her again.  Emma Dash called back shortly thereafter, and they discussed Mr. Dash's cancelled discharge, safety plans and DCF involvement.[94]

iii.  <u>Staff Observations of Mr. Dash in the Early Evening of March 14, 2019</u>

Nacole Key, certified nursing assistant, had been assigned to do the 15-minute rounds the afternoon of March 14, 2019.  Nacole Key completed the Patient Observation Level Checklists for Mr. Dash.  Nacole Key noted she observed Mr. Dash is his room at 5:00 P.M., 5:15 P.M., and 5:30

---

[88] D-001, DEF000135
[89] D-001, DEF000135
[90] D-001, DEF000126; D-007
[91] D-005
[92] D-005
[93] D-005
[94] D-005

P.M.[95]  At 5:45 P.M., Nacole Key observed Mr. Dash standing in his room and asked Mr. Dash to

go to dinner, and he refused.[96]





[97]

Before Nacole Key could return for her next check during the 6:00 P.M. 15-minute block,

Mr. Dash was found unresponsive behind his patient room door, and a rapid response code called.[98]

Staff removed the knotted clothing item from Mr. Dash's neck and immediately started CPR.[99]

---

[95] D-002

[96] D-001, DEF000135

[97] D-002 (emphasis added)

[98] D-001, DEF000135.

[99] D-001, DEF000135

Five minutes later, at 6:06 P.M., a code blue was called as Mr. Dash remained unresponsive and was ultimately transferred to the emergency room.[100]  Despite their efforts to revive him, Mr. Dash never regained consciousness in the emergency department, and was declared dead by Dr. Min Zhou at 6:40 P.M.[101]  Dr. Zhou notified Mr. Dash's mother directly about the death as his listed next-of-kin.[102] The cause and manner of death determined by the post-death autopsy was suicide by hanging.[103]

As a result of the code blue being called, VA police appeared in Unit 3C.[104] After Mr. Dash was removed from Unit 3C and taken to the emergency department, the area was secured and no one was allowed to leave.[105] Upon reporting the adverse incident, members of the VA Office of Inspector General ("VA OIG") responded to conduct an investigation. Over the next several weeks post-incident, VA OIG would interview numerous employees and review many documents.  The end result of VA OIG's investigation was a report dated August 22, 2019, published publicly on its website (the "VA OIG Report").[106]  While certain deficiencies were noted, the VA OIG concluded that Mr. Dash "received reasonable care while admitted to a locked inpatient mental health unit. The patient was appropriately screened for suicide risk, provided medication management, placed on close observation status, and had on-going assessments, interventions, and a discharge plan by physicians, nurses, and social workers."[107]

---

[100] D-001, DEF000135
[101] D-001, DEF000118
[102] D-001, DEF000119
[103] D-008
[104] D-007
[105] D-007
[106] VA OIG Report, No. 19-07429-195 (Aug. 22, 2019),
*available at* https://www.va.gov/oig/pubs/VAOIG-19-07429-195.pdf (last checked Jan. 9, 2023).
The Court may take judicial notice of the VA OIG Report.  *See* Fed. R. Evid. 201(b)(2).
[107] VA OIG Report, p. 25.

I.    **THE COURT FINDS THE OPINIONS OF DEFENDANT'S EXPERTS CREDIBLE, AND ADOPTS THEIR OPINIONS**

Defendant tendered one expert witness who opined on the liability aspect of this case—Richard Elliott, M.D., Ph.D.  The Court finds Dr. Elliott credible, and his opinions based upon reliable methodologies in his respective field.  Therefore, as explained in detail below, the Court adopts his opinions presented at the trial and finds that WPB VAMC employees met the standard of care for the medical and psychiatric care received by Mr. Dash in March 2019.

Defendant also tendered Martin Segel, Ph.D. and Stuart Goldman, M.D. to opine on the damages aspect of this case as it relates to the claimed injuries of Mr. Dash's survivors—Emma Dash, Jada Dash, B.D., and N.D. Defendant also retained a vocational rehabilitationist, Steve Bast, to evaluate Mr. Dash's likely employment prospects had he lived.  Lastly, Defendant tendered the testimony of its retained economist expert, Minh Doan.  The Court finds the opinions of these additional experts credible, and their opinions based upon reliable methodologies in their respective fields.  Therefore, as explained in detail below, the Court adopts the opinions presented at the trial and finds that Plaintiff failed to prove a breach of the standard of care by Defendant.  And, even if there was a breach, Plaintiff failed to prove a causal link between such a breach and Mr. Dash's death, and the damages sought by Plaintiff on behalf of herself and the survivors of Mr. Dash.

i.  <u>Standard of Care for Inpatient Mental Health Treatment – Dr. Richard Elliott</u>

Defendant retained Dr. Richard Elliott, a board-certified psychiatrist to evaluate the psychiatric and medical care provided by WPB VAMC employees to Mr. Dash in March 2019.  Dr. Elliott was also proffered to opine on the psychological impact of Mr. Dash's death on the survivors, having conducted both a records review, and in-person interviews of Emma Dash, Jada

Dash, and B.D.  The Court finds that Dr. Elliott is qualified to provide these opinions due to his education, training, and experience as described to the Court.  Dr. Elliott opined, to a reasonable degree of medical certainty, that the care provided to Brieux Dash at the WPB VAMC between March 11 – March 14, 2019 was reasonable, did not deviate from the standard of care, and met the standard of care for such care in Florida in March of 2019. The Court finds Dr. Elliott's testimony credible and agrees with his findings.

The Court has already ruled that Plaintiff's proffered expert, Steven Bruce, Ph.D. is not qualified to render an opinion on the standard of care for psychiatry.[108] Dr. Bruce is a clinical psychologist and professor who has never worked on or provided mental health treatment or care on an acute inpatient psychiatric unit in a hospital, or any other inpatient psychiatric setting, as a psychiatrist, psychologist, nurse, or nursing assistant.  After considering Dr. Bruce's testimony, the Court does not find persuasive Dr. Bruce's opinions regarding the standard of care on the remaining theories of liability.

    ii. <u>Opinions regarding mental state of Emma Dash, Jada Dash, & B.D. – Dr. Martin Segel</u>

Defendant retained Dr. Martin Segel, a board-certified psychologist to evaluate the claimed psychological effects of Mr. Dash's death on Emma Dash, Jada Dash, and B.D. The Court finds that Dr. Segel is qualified to provide these opinions due to his education, training, and experience as described to the Court.  Dr. Segel conducted both in-person interviews and medical records review of Emma Dash's extensively documented prior mental health diagnoses and complaints, and the treatment records of her two children, Jada and B.D. Dr. Segel opined that he was unable to conclude whether any symptoms detected at present were directly caused by Mr. Dash's death

---

[108] D.E. 134, p.8

or to what degree in comparison with other traumas experienced by Emma Dash, Jada Dash, and B.D. prior to and subsequent to Mr. Dash's death. The Court finds Dr. Segel's testimony credible and agrees with his findings.

iii.   <u>Opinions regarding mental state of N.D. – Dr. Stuart Goldman</u>

Defendant retained Dr. Stuart Goldman, a psychiatrist board certified in General Psychiatry and Child and Adolescent Psychiatry to evaluate the claimed psychological effects of Mr. Dash's death on N.D., Mr. Dash's son with Waraporn Chomchuen. The Court finds that Dr. Goldman is qualified to provide these opinions due to his education, training, and experience as described to the Court.  Dr. Goldman opined, based upon his interviews and record review, that, overall, N.D. is doing reasonably well, given his history of traumatic experiences prior to Mr. Dash's death when N.D. was approximately 4 years old, and that he has been making the transition to living and going to school in Germany. While N.D. expressed some sadness about his father's death, it was both expectable and appropriate and does not appear to significantly compromise N.D.'s current functioning. Neither he nor his mother (i.e., Waraporn Chomchuen) endorsed symptoms consistent with either an affective or traumatic disorder.  The Court finds Dr. Goldman's testimony credible and agrees with his findings.

## II.  THE COURT FINDS THE OPINIONS OF DEFENDANT'S EXPERTS REGARDING PLAINTIFF'S CLAIMED ECONOMIC DAMAGES CREDIBLE AND ADOPTS THEIR FINDINGS.[109]

### i.  Steve Bast

Defendant retained an expert vocational rehabilitation counselor, Steve Bast. The Court finds that Mr. Bast is qualified to provide these opinions due to his education, training, and experience as described to the Court.   In order to determine the most likely next employment option for Mr. Dash if he had lived, Mr. Bast performed a transferable skills analysis – a comparison of somebody's capability to do the requirements of work.  In conclusion, Mr. Bast's opinion involved two scenarios for Mr. Dash's most likely career paths.  The first was scenario #1, where Mr. Dash did intermittent marginal work resulting in weighted earnings of $11,203.00 per year.  The second scenario was broken into near-term and long-term occupations, such as potential work as an automobile mechanic or electronic equipment repairer.  For this second scenario, Mr. Bast projected Mr. Dash's earning capacity at $31,284 for the first 4–6 years and $34,418 for the remaining years of Mr. Dash's work-life expectancy. The Court finds Mr. Bast's testimony credible and agrees with his findings.

### ii.  Minh Doan

Relying on Mr. Bast's assessment of Mr. Dash's lifetime earning capacity, and, upon correcting key flaws in Plaintiff's expert's calculation of lost earnings, Ms. Doan opined that

---

[109] Defendant's position is that judgment in its favor is appropriate because Plaintiff has not proven her claims or their viable theories of liability by a preponderance of the evidence.  Therefore, its proposed Findings of Fact and Conclusions of Law are written for the Court to find that the Defendant has no liability.  Defendant also presents alternative findings in the event the Court finds that there is comparative negligence in this case; however, Defendant's position is that Defendant's comparative negligence is minimal.  In these alternative findings, Defendant includes findings as to the maximum amount of damages Plaintiff established by a preponderance of the evidence at trial.

Plaintiff's adjusted claimed economic losses are reduced to approximately $200,000.00 to $220,000.00. And, when survivor benefits are deducted, the calculation yields zero economic loss. The Court finds that Ms. Doan is qualified to provide these opinions due to her education, training, and experience.   The Court further finds Ms. Doan's testimony credible and agrees with her findings.

## CONCLUSIONS OF LAW

**I.     THE COURT FINDS THAT PLAINTIFF HAS NOT ESTABLISHED THAT DEFENDANT IS NEGLIGENT AND JUDGMENT SHALL BE ENTERED IN THE FAVOR OF DEFENDANT.**

As set forth in detail below, the Court finds that Plaintiff has not proven the elements of her medical negligence claim under the theories pled and presented at trial.   Therefore, the Court finds Defendant was not negligent and judgment shall be entered in favor of the United States.

### a.   FTCA and applicable Florida law

In FTCA cases such as this one, the court determines liability by applying the appropriate law of the forum state.   28 U.S.C. §§ 1346(b), 2674.   *See Massey v. United States*, 733 F.2d 760 (11th Cir. 1984).   There is no dispute the laws of Florida apply here.

This action was brought under Florida's Wrongful Death statute, which permits a personal representative of the deceased to file a legal action in his name, and for the benefit of any survivors. § 768.21, Fla. Stat. The Wrongful Death Act allows the personal representative of an estate "to recover for (1) loss of past and future support and services; (2) loss of companionship; and (3) his or her own mental pain and suffering from the date of the injury." *In re Air Crash on Dec. 20, 1995 Near Cali, Colombia,* No. 96–MD–1125, *et al.,* 1998 WL 1770590, *2 (S.D. Fla. 1998) (emphasis omitted).   In the Complaint, Plaintiff pled a claim for medical negligence as it relates to the care Mr. Dash received at WPB VAMC in March 2019.   The Court further finds that Plaintiff

is limited to the theories of negligence pled in the Complaint (and the administrative claim placing the agency on notice).

"In Florida, traditional negligence requires proof of four elements: (1) duty of care; (2) breach; (3) legal or proximate causation; and (4) actual damages." *Poltorak v. Ferrell*, 16-81832-CIV, 2018 WL 1718688, at *3 (S.D. Fla. Jan. 4, 2018) (citing *Wallace v. Dean*, 3 So.3d 1035, 1047 (Fla. 2009) and *Williams v. Davis*, 974 So.2d 1052, 1056 (Fla. 2007)). As Plaintiff's claims are pled and premised upon theories of medical malpractice, Plaintiff must also establish "the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." *Whittaker v. Sanchez*, No. 19-13486, 2021 WL 4495808, at *3 (11th Cir. Oct. 1, 2021) (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). This must be established with the use of expert testimony.

Florida law defines the standard of care as follows:

> The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

§ 766.102(1), Fla. Stat. To meet her burden, the plaintiff must present sufficient expert testimony to establish the standard of care. *Lambert v. United States*, 198 F. App'x 835, 839 (11th Cir. 2006) (citing *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995)) ("Generally, the standard of care in medical malpractice cases is determined through expert testimony."); *see also Mann v. Carnival Corp.*, 385 F. Supp. 3d 1278, 1285 (S.D. Fla. 2019), *report and recommendation adopted*, No. 18-21364-CIV, 2019 WL 2254963 (S.D. Fla. May 8, 2019) (citing *Rivera v. Royal Caribbean Cruises Ltd.*, 711 F. App'x 952, 954 (11th Cir. 2017)) ("Expert testimony is required to establish medical

causation for  conditions not readily observable or susceptible to evaluation by lay persons."); *Wausau Ins. Co. Tillman*, 765 So. 2d 123, 124 (Fla. 1st DCA 2000) (same).

This requirement is due to the "specialized knowledge necessary to show what a 'reasonably prudent' physician would consider 'acceptable and appropriate'[.]" *Jerrett v. United States*, No. 20-cv-134-KMM, 2022 WL 599200, at *2 (M.D. Fla. Feb. 11, 2022) (citing *Pate* and *Chirillo v. Granicz*, 199 So. 3d 246, 252 (Fla. 2016)). Expert testimony is required and "conclusory allegations about what the medical record means in the context of the standard of care are not enough to support …[when plaintiff] appears to directly challenge the course of treatment that Defendants prescribed, …" *Jerrett* at *2 (*appeal dismissed*, 22-10557-G, 2022 WL 3584316 (11th Cir. June 13, 2022)).

"Under Florida law, "[a] finding of breach of a duty of care on the part of a defendant … does not establish a right to recovery by the plaintiff unless the plaintiff can also show causation and damages." *Giter v. United States*, No. 3:08-cv-622-J-MCR, 2010 WL 375929 at *6 (M.D. Fla. Jan. 25, 2010); *Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 224 (11th Cir. 2021) ("A plaintiff does not sustain his burden of proof by relying on pure speculation.") (quoting *Cox v. St. Josephs Hosp.*, 71 So. 3d 795, 799 (Fla. 2011)); *Hessen for Use & Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 647 (11th Cir. 1990) ("a mere possibility of causation is not enough").

If a plaintiff can establish a breach of the duty that caused the harm, then a plaintiff can also recover damages.  "Under Florida law, the only future damages available relative to income are damages for loss of earning capacity." *W.R. Grace & Co. v. Pyke*, 661 So. 2d 1301, 1302 (Fla. 3d DCA 1995) (citation omitted). Lost earning capacity "compensate[s] a plaintiff for loss of capacity to earn income as opposed to actual loss of future earnings." *Benjamin v. Diel*, 831 So.

2d 1227, 1229 (Fla. 4th DCA 2002). In other words, a fact-finder "is not to be concerned with *actual* future loss of earnings, but only with the loss of the *power to earn. W.R. Grace*, 661 So. 2d at 1304 (emphasis added). "A plaintiff must present evidence which allow a jury to reasonably calculate lost earning capacity." *Id.* at 1302.  Factors to be considered when calculating measure of damages include "the plaintiff's age, health, habits, occupation, surrounds, and earnings before and after the injury." *Id.*  The Court further notes that even if Plaintiff had not withdrawn her claim for hedonic damages (a topic Plaintiff's proffered economic expert Dr. Stan Smith typically opines on), the Court would nonetheless find that such damages are not made a part of section 768.21, Florida Statutes, and therefore, not recoverable. *See Brown v. Seebach*, 763 F. Supp. 574, 583 (S.D. Fla. 1991) (declining to award hedonic damages as not provided for by statute and no Florida case law where such damages awarded).

### b.  Plaintiff failed to establish Defendant breached the relevant standard of care as it relates to the 15-minute rounds performed before Mr. Dash's suicide

The Court finds that Plaintiff failed to prove Defendant breached the standard of care as it relates to the 15-minute rounds performed the afternoon of March 14, 2019 before Mr. Dash died by suicide.  The Court finds based on a review of the evidence admitted at trial, that Nacole Key performed her 15-minute rounds for Mr. Dash on the afternoon of March 14, 2019, including her round for Mr. Dash at approximately 5:45 P.M.  The uncontroverted evidence is that Nacole Key visually observed Mr. Dash in his room at this time.  At the time she performed this check, Mr. Dash was alive and did not exhibit suicidal behavior.  According to the 15-minute rounding protocol at WPB VAMC, another round was to occur approximately 15 minutes later.  In the time before the next check was to occur, Mr. Dash died by suicide.  While the outcome for Brieux Dash is unfortunate, Ms. Key's performance of her 15-minute rounds, including the most recent check

at 5:45 P.M., met the standard of care, as explained by Defendant's expert, Dr. Elliott, and there was no breach in the standard of care.

The Court rejects Plaintiff's arguments that Ms. Key's failure to fully fill out the Patient Observation Level Checklist was a breach of the standard of care as the form itself is not what treaters rely on in a moment of concern. The Court also rejects Plaintiff's unproven and speculative contention that Ms. Key's performance of a quick blood draw in the 15-minute interim between 5:45 P.M. and 6:00 P.M. before her next check on Mr. Dash was to take place caused or contributed his death. Therefore, Plaintiff cannot prove medical negligence on this theory, and the Court finds in favor of Defendant.

### c. Plaintiff failed to establish Defendant breached the relevant standard of care as it relates to contact with Emma Dash during Mr. Dash's treatment

The Court also finds that Plaintiff failed to prove Defendant breached the standard of care as it relates to the contact with Emma Dash while Mr. Dash was receiving inpatient treatment from March 11 through March 14, 2019. The Court finds, based on a review of the evidence admitted at trial, that Mr. Dash did not sign a release of information form authorizing WPB VAMC employees to contact anyone until March 13, 2019, when Brieux Dash signed a release of information regarding his treatment as it related to his mother, Shenita Nelson. On March 13, 2019, WPB VAMC employees then contacted Shenita Nelson regarding Mr. Dash, and confirmed his plan to relocate to upstate New York once discharged the following day.

The Court finds credible WPB VAMC employees' testimony that it was not until Mr. Dash's professed future plans suddenly changed to now involve removing his young minor son, N.D., from the family home on his way to upstate New York to stay with Mr. Dash's mother, did WPB VAMC employees begin making further efforts to contact Emma Dash on March 14, 2019. The Court also finds persuasive the fact that Brieux Dash expressly refused to give his permission

or consent for any communication with Emma Dash regarding his treatment prior to March 14, 2019, as one of the aggravating factors leading to his involuntary admission in Unit 3C in the first place was significant marital conflict with his wife. The Court also finds persuasive the need for WPB VAMC staff to develop a therapeutic, trusting relationship with Mr. Dash and does not find that the standard of care required WPB VAMC staff to violate Mr. Dash's privacy and express wishes not to contact his wife prior to March 14, 2019. Plaintiff also fails to establish a causal connection between the timing of the contact with Emma Dash and Mr. Dash's death.

In general, Plaintiff asks the Court to consider a multitude of alternative scenarios where Mr. Dash's death could have been prevented, and then simply attributes fault to Defendant. To do so without reliable and admissible evidence and support is improper under the law and prejudices defendants in general in the defense of their cases. *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (stating that inferences based upon speculation are not reasonable). This rule against stacking inferences "protect[s] litigants from verdicts based on conjecture and speculation." *Id.* (quoting *Zota*, 192 So. 3d at 537). These theories unsupported by evidence do not rise to the level of proving negligence, and the Court finds in favor of Defendant on these theories.

> **d. Plaintiff did not prove their other theories of negligence, which had been abandoned at the summary judgment stage for failure to refute**

The Court finds Plaintiff failed to establish any breach of any standard of care or the requisite causal link to Mr. Dash's death for any of her remaining theories of medical malpractice in the Complaint, and for many, they were abandoned or waived by Plaintiff in opposition to summary judgment, and the Court necessarily finds in favor of Defendant on these points. *See* D.E. 134. Other than the issue of the 15-minute rounding and timing of contact with Emma Dash, consistent with the Court's prior rulings, any theory of negligence that was properly placed before the Court was dismissed from this case before trial.

II.   **THE COURT FINDS THAT THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA BARS PLAINTIFF FROM RECOVERING ON OTHER THEORIES OF LIABILITY**

In its Order Granting in Part Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, this Court ruled it lacks subject matter jurisdiction over Plaintiff's claim that the agency "could" have used an alternative type of corridor door and should have installed over-the-door alarms.  D.E. 123.  Therefore, this issue has already been resolved in favor of Defendant.

III.   **CONCLUSION**

Accordingly, the Court finds no negligence by the United States. Because the Court finds no liability on the part of the United States, damages are not analyzed and the collateral source rule, which would otherwise be applicable and available to the United States, is not relevant. Judgment shall be entered in favor of the United States.

**DONE AND ORDERED** in Court in West Palm Beach, Florida, on January ___, 2023.


_____
**DONALD M. MIDDLEBROOKS**
**UNITED STATES DISTRICT JUDGE**


Copies to: Counsel of Record