**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-80015-CV-MIDDLEBROOKS/Matthewman

EMMA DASH, as personal representative
for the ESTATE OF BRIEUX DASH, for
benefit of his survivors and estate; EMMA
DASH; JADA S. DASH; B.D., JR.; and N.D.,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendants.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendant's Motion for Summary Judgment ("Motion") (DE 71), filed on August 25, 2022. The Motion is fully briefed. (DE 73; DE 111; DE 112; DE 118; DE 119). For the reasons set forth below, Defendant's Motion is granted in part.

### BACKGROUND

This case arises out of the death by suicide of Mr. Brieux Dash ("Decedent Dash") at the West Palm Beach VA Medical Center's ("WPVA") inpatient psychiatric unit ("Unit 3C") on March 14, 2019.[1] Unit 3C is a short-term stabilization program for veterans in acute mental health distress. (DE 73 ¶ 1). Decedent Dash was a 33-year-old U.S. Army veteran who served two tours of duty in Iraq. (DE 111 at 2). Due to his time in Iraq, Decedent Dash developed PTSD. (*Id*. at 3). On March 11, 2019, Emma Dash, Decedent Dash's widow and Plaintiff in this case, called police to report her concerns about Decedent Dash potentially harming himself. (DE 73 ¶ 18).

---

[1] The facts herein, unless stated otherwise, are undisputed by the Parties.

That same day, Decedent Dash was involuntarily admitted to the WPVA's Unit 3C pursuant to the Florida Baker Act for safety and stabilization of depression. (*Id.* ¶ 19). The Baker Act only allows for 72 hours of involuntary commitment. (DE 71 at 3).

The first three days of Decedent Dash's commitment were without incident. On March 14, 2019, at 9:36 a.m., Decedent Dash was scheduled to be discharged from the WPVA. (DE 73 ¶ 36). At 10:05 a.m., he signed a form to become a voluntary patient of Unit 3C. (*Id.* ¶ 40). Decedent Dash planned to travel to New York with his youngest son. (*Id.* ¶ 37). The WPVA still had the right to hold Decedent Dash for another 24 hours after a request to be discharged. (*Id.* ¶ 45).

That same day, the medical staff advised Decedent Dash that a social worker would need to contact his wife and obtain information from the Department of Children and Families to approve his discharge plan. (*Id.* ¶¶ 46-47). Decedent Dash had not signed a release of information ("ROI") for the WPVA to contact his wife. Social workers at the WPVA do not normally contact collateral sources (like his wife) without a ROI unless there are concerns about the safety of others. (*Id.* ¶ 48).[2] However, on March 11, 2019, a social worker noted in Decedent Dash's medical file that although the ROI was not signed, "given the Veteran's BA admission and the circumstances surrounding admission, it was discussed with Treatment Team that it is considered clinically appropriate for [a social worker] to attempt to speak with wife to obtain collateral information for discharge planning." (DE 101-1 at 23).

---

[2] Plaintiff responds to this statement of material fact ("SMF") with: "Disputed. Defendant's citation to the record does not support this statement." (DE 112 ¶ 48). This is an insufficient response under Local Rule 56.1, which requires a citation to the record that adequately disputes the opposing party's material fact. Moreover, in response to Defendant's SMF ¶ 26, Plaintiff responds with the same proposition and cites to the same deposition as Defendant in SMF ¶ 48. (*See* DE 112 ¶ 26). Accordingly, this fact is deemed undisputed.

In the late morning on March 14, 2019, for the first time, a social worker (Ms. Keyes) attempted to contact Mrs. Dash.³ (DE 112 ¶ 87). That afternoon, Mrs. Dash told Ms. Keyes that Decedent Dash had been physically aggressive towards her, prompting Ms. Keyes to end the conversation and speak with the attending psychiatrist (Dr. Reoyo). (*Id*. ¶¶ 89-90). In response, Dr. Reoyo decided to delay Decedent Dash's discharge until March 15, 2019. (*Id*. ¶ 91). Upon learning of this news, Decedent Dash's mental state quickly became unstable.

On the afternoon of March 14, 2019, certified nursing assistant Key ("CNA Key") was assigned to perform 15-minute observation rounds on Decedent Dash. All patients in Unit 3C are checked on, typically by a CNA, every 15 minutes ("Rounds") to ensure they are okay. (DE 73 ¶¶ 12-13). When performing rounds, CNAs use a pre-printed checklist to document the location and behavior of the patient. (*Id*. ¶¶ 14-16). From 2:00-6:00 p.m., CNA Key only documented the location of Decedent Dash, not his behavior. Moreover, between 5:45-6:00 p.m., CNA Key performed a blood draw on another patient. At 6:00 p.m., Decedent Dash was found unresponsive.

On January 5, 2022, Plaintiff Emma Dash, the personal representative for Decedent Dash's Estate, initiated this wrongful death suit against the United States on behalf of Decedent Dash's Estate and his survivors. (DE 1).

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material[]" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A dispute over a

---

³ The Parties dispute whether this timing breached the standard of care and led to Decedent Dash's suicide.

material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

The moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must "go beyond the pleadings" and by "affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Id.* at 322. "The court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

## DISCUSSION

This is a Federal Tort Claims Act ("FTCA") case. As such, the court must look to the law of the forum state. 28 U.S.C. §§ 1346(b), 2674. Plaintiff alleges various theories of medical

negligence under Florida's wrongful death statute. (DE 1 ¶ 25 (a)-(i)).[4] "To succeed on a claim of negligence, a plaintiff must establish the four elements of duty, breach, proximate causation, and damages." *Limones v. Sch. Dist. of Lee County*, 161 So. 3d 384 (Fla. 2015). Moreover, in a case with claims for medical negligence, the Plaintiff "must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claimed." *Gooding v. U. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

Fla. Stat. § 766.102(1) defines the standard of care as follows: "The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102(1) (2022). "In medical malpractice cases, the standard of care is determined by a consideration of expert testimony." *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995).

As it relates to proximate causation, "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding*, 445 So. 2d at 1108. "A 'harm is proximate in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act

---

[4] On January 9, 2023, I entered an Order Granting in Part Defendant's *Daubert* Motion. (DE 134). In that Order, I held that Plaintiff's expert is barred from testifying as to theories of liability under ¶ 25 (d), (e), and (h) in the Complaint (DE 1). Moreover, I held that Plaintiff is limited to the theories of liability under ¶ 25 (a), (b), (c), (f), (g), and (i) in the Complaint. On January 11, 2023, Plaintiff moved for partial reconsideration of that Order to allow argument on Decedent Dash's access to "additional pajamas . . . used to fashion the ligature he created to hang himself." (DE 138 at 1). Defendant's Motion for Summary Judgment does not implicate that theory of liability and thus I do not address it here.

or omission in question.'" *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018).

The following three Sections analyze Defendant's Motion for Summary Judgment as it relates to Plaintiff's remaining theories of liability.[5] Section I covers theories of liability arising under ¶ 25 (a), (b), and (c) in the Complaint. (DE 1). Section II covers ¶ 25 (f) and (g). (*Id.*). Section III covers (i). (*Id.*).

### I.   15-Minute Safety Rounds

Plaintiff alleges that CNA Key was negligent for (1) failing to properly fill out the Rounds checklist, (2) falsifying entries in the checklist, and (3) performing a blood draw before the Decedent Dash's 6:00 p.m. Round. (DE 1 ¶ 25 (a)-(c)). Defendant moves for summary judgment on these allegations by arguing, *inter alia*, that Plaintiff's allegations are overly speculative and cannot establish causation. (DE 71 at 9, 15). I will take each in turn,

First, CNA Key's failure to properly document Decedent Dash's behavior is not causally connected to Decedent Dash's death. Bavegehims' testified that the checklists are uploaded to an electronic system at the end of the 24 hours. (DE 85-7 at 6). However, "if the patient is acting out, that is immediately reported to the nurse and the physician . . . even though it's not documented." (*Id.*). Thus, even if CNA Key had properly filled out the form from 2:00-6:00 p.m., it would not have been uploaded until midnight that day, six hours after Decedent Dash's death.

Second, CNA Key testified that while she did not properly fill out the checklist between 2:00-6:00 p.m. on March 14, 2019, she did perform the Rounds and laid eyes on him. (DE 70-4 at 3; DE 85-4 at 5). Plaintiff's only "evidence" of falsification (*i.e.*, that CNA Key was untruthful

---

[5] Part of Plaintiff's Response is essentially a *Daubert* motion to exclude testimony of Defendant's expert witness. (DE 111 at 11-15). This request is improper as it is not a separate motion that complies with the Local Rules and is untimely under the pretrial scheduling order. (*See* DE 18). Accordingly, Plaintiff's argument on this issue will not be considered.

6

in her deposition) is that her failure to properly fill out the checklist is an indication of her failure to perform the Round at all. (DE 112 ¶ 59). It is true that it was WPVA's policy for CNAs to note at least one behavior or activity in the Checklist (*id.*), but failure to do so does not indicate that the CNA did not perform the Round. Without further evidence, I find this to be an unreasonable and speculative inference to draw in favor of Plaintiff. *See Ellis v. Eng.*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

Third, the purpose of not performing other tasks in between Rounds is to avoid losing focus on the patient's "whereabouts, activity, and behavior." (DE 81-1 ¶ 36). Here, CNA Key's blood draw overlapped with the time that another patient found Decedent Dash unresponsive. *Compare* (DE 70-4 at 3-4) (CNA Key stating "it was 6:01 at – when I was labelling his blood work.") *with* (DE 70-1 at 37-38) (Nurse Montada stating Decedent Dash was found unresponsive at 6:01 p.m. after another patient alerted staff). This raises a genuine issue of material fact as to causation. As to breach (or standard of care), the Parties' experts disagree as to whether CNAs should be able to "immediately intervene" in between Rounds. *Compare* (DE 71 at 11) (Government's expert opining that "[w]hat is most important is whether those additional tasks interfere with the observation rounds or prevent the observation rounds.") *with* (DE 67-2) (Plaintiff's expert opining that the "direct line-of-sight" is the standard of care). Accordingly, causation and breach as it relates to CNA Key's blood draw during her Rounds are triable issues for trial.

**II.     Staffing Requirements and Training**

Defendant challenges Plaintiff's ability to show that any failure by the WPVA to implement VHA staffing levels (DE 1 ¶ 25 (f)) and Mental Health Environment of Care Checklist ("MHEOCC") training (*Id*. ¶ 25 (g)) caused Decedent Dash's death. (DE 71 at 19). Plaintiff's Response all but abandons these theories of liability by not addressing these arguments. (*See* DE

7

111 at 11) (responding to Defendant's causation argument as to one-on-one care and failure to timely contact Mrs. Dash). However, Plaintiff's expert relied on VHA Directive 1167 to opine that the lack of "direct line-of-sight observation" method for Rounds led to CNA Key's alleged negligence (as described above). (DE 67-2 ¶¶4-5). That opinion read in conjunction with Plaintiff's response makes clear that she did not intend to abandon her Rounds theory of liability. As such, I will liberally construe Plaintiff's response as incorporating her expert's June 9, 2022, opinion regarding VHA Directive 1167. Accordingly, summary judgment is granted in part as to the theories of liability under ¶¶ (f) and (g). (DE 1). At trial, Plaintiff may only rely on WPVA's alleged failure to implement VHA Directive 1167.

### III. Timely Contacting Mrs. Dash

Plaintiff alleges that social workers on duty from March 11, 2019, through March 14, 2019, at the WPVA breached their standard of care by failing to timely contact Mrs. Dash. (DE 1 ¶ 25 (i)). Plaintiff's expert opines that his delay was a breach of the standard of care and led to Decedent Dash's death as the sudden news of his delayed discharge destabilized him. (*See, e.g,* DE 67-2 ¶¶13-15). Defendant challenges that this delay was a violation of the standard of care.[6] (DE 71 at 12). Defendant's expert opines that it was not a violation of the standard of care due to privacy considerations. (*See* 69-2 at 27-28). Accordingly, this is a battle-of-experts issue for trial.

---

[6] Defendant does not appear to challenge Plaintiff's ability to show causation.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendants' Motion for Summary Judgment (DE 71) is **GRANTED IN PART**.

**SIGNED** in Chambers at West Palm Beach, Florida, this 12th day of January, 2023.

Donald M. Middlebrooks
United States District Judge